302 A.2d 757.

RHODE ISLAND CONSUMERS' COUNCIL *vs.* ARCHIE SMITH
*et al.*

NEW ENGLAND TELEPHONE AND TELEGRAPH COMPANY *vs.*
PUBLIC UTILITIES COMMISSION.

MARCH 28, 1973.

PRESENT: Paolino, Powers, Joslin and Kelleher, JJ.

272

Joslin, J. This is a public utility rate case. On April 16, 1971, the New England Telephone & Telegraph Company ("the company"), under authority of G. L. 1956 (1969 Reenactment) §39-3-11, as amended by P. L. 1969, ch. 240, sec. 5, filed with the Public Utilities Commission ("the commission") a tariff revision designed to add approximately $14,800,000 to its annual revenue. While the company had scheduled the new tariffs to take effect on May 15, 1971, their inception was suspended initially by a commission order entered under §39-3-11, as amended, and, according to the parties, thereafter from time to time pursuant to regulations of the Presidential Price Commission and the utilities commission's suspension orders related thereto. Extensive public hearings before the commission followed at which the Rhode Island Consumers' Council

("the council"), among others, appeared in opposition to the rate increase.

On May 4, 1972, the commission announced its decision. The proposed tariffs were rejected and the company was authorized to file in their stead a modified rate schedule structured to increase revenues by approximately $7,989,-000. Thereafter, the company and the council acting under authority of §39-5-1, as amended, commenced separate certiorari proceedings in order to test the legality and reasonableness of the commission's decision and order.[1] The two petitions were consolidated and, pending argument, we denied the request (1) of the council for a stay of the commission's order permitting the company to file a modified revision of its rates; and (2) of the company for leave, pending final determination, to be permitted to operate on its proposed rate schedule. *Rhode Island Consumers' Council* v. *Smith*, 110 R. I. 910, 290 A.2d 617 (1972).

## HISTORY OF THE PROCEEDINGS

The last general increase in telephone rates authorized by the commission took effect in February, 1970. *New England Tel. & Tel. Co.*, Docket No. 1024 (Jan. 30 and Feb. 10, 1970). In that case the company was afforded the opportunity to increase its annual revenue in the approximate amount of $5,925,000. The company's principal justification for its current filing is that the impact of an acknowledged inflationary economy on its operating expenses and upon the cost of needed plant and equipment have far outdistanced its revenues despite the 1970 in-

---

[1]Although commission proceedings are generally subject to the provisions of the Administrative Procedures Act, judicial review of its orders and decisions are governed by G. L. 1956 (1969 Reenactment) §39-5-1 as amended by P. L. 1969, ch. 240, sec. 8. *See Yellow Cab Co.* v. *Ferri*, 108 R. I. 80, 272 A.2d 326 (1971); *Rhode Island Consumers' Council* v. *Public Utilities Comm'n*, 107 R. I. 284, 267 A.2d 404 (1970). It is for this reason that the case comes to us directly from the commission rather than via the Superior Court.

creases. Unless relief is granted, the company says, the return on its intrastate investment will decrease to a dangerously low level and its general financial condition will further deteriorate. To demonstrate its dire position, the company presented evidence showing, *inter alia,* that in the period between 1968 (the test year used by the commission in *New England Tel. & Tel., supra*) and 1971: (1) its average net investment has increased 40.1 per cent and its operating expense 14.6 per cent whereas the corresponding increase in its revenue has been only 13.6 per cent; and (2) its actual rate of return under the January 30, 1970 order has remained at an average of about 6 per cent rather than in the 7.4 per cent to 7.65 per cent range authorized by the commission.

It is the asserted inadequacy of the 1970 authorization as a source of revenue for bridging the gap between available revenue on the one hand, and the need for new funds to meet expenses and to provide plant on the other, which prompted this current proposal. Following public hearings on the reasonableness of that proposal, the commission filed a written decision and order which:

1. rejected the company's April 16, 1971 filing;

2. authorized the filing of a revised tariff designed to produce additional annual revenue in the approximate amount of $7,989,000;

3. forbade the inclusion in the tariff thus authorized of an increase in rates for the Hopkinton-Richmond area and

4. directed the incorporation therein of a special rate for certain persons 65 years of age or over.

## GROUNDS FOR REVIEW

The company challenges the commission's order because it is allegedly confiscatory in that it fails to provide the company with an opportunity to earn a fair and reasonable return on the investment it employs in providing intrastate telephone service. More specifically, it claims that

the order is illegal, arbitrary and unreasonable in the following particulars:

    1. the selection of a test period;

    2. the computation of operating expenses and utility revenues;

    3. the establishment of a rate base;

    4. the setting of 8.38 per cent as the rate of return;

    5. the barring of an increase in rates for the Hopkinton-Richmond area; and

    6. the granting of a special rate for certain elderly subscribers.

The council also challenges the commission's order and claims that it erred in:

    1. selecting a test period;

    2. overstating the rate base in certain designated areas; and

    3. authorizing the filing of a revised tariff.

## THE CONTROLLING GUIDELINES

In passing upon the legality and reasonableness of the commission's decision and order we do not engage in fact-finding. General Laws 1956 (1969 Reenactment) §39-5-3, as amended. That is the commission's role; ours is to determine whether the commission's decision and order are lawful and reasonable and whether its findings are fairly and substantially supported by legal evidence and sufficiently specific to enable us to ascertain if the facts upon which they are premised afford a reasonable basis for the result reached. *Town of Jamestown* v. *Kennelly,* 81 R. I. 177, 180-81, 100 A.2d 649, 651 (1953). This is not to say that the necessary factual determinations must be set out in precise or specific language, or that they may not be fairly and reasonably implied from the commission's language and actions. *United Transit Co.* v. *Public Utility Hearing Board,* 96 R. I. 435, 445, 192 A.2d 423, 428-29 (1963); *Yellow Cab Co.* v. *Public Utility Hearing Board,*

79 R. I. 507, 511, 90 A.2d 726, 728 (1952). But if it becomes impossible for us properly to fulfill our assigned function because of the commission's failure to set forth sufficiently the findings and the evidentiary facts upon which it rests its decisions, or the reasons or true bases for its conclusions, we will not speculate thereon nor search the record for supporting evidence or reasons. Neither will we decide for ourselves what is proper in the circumstances. Instead, we will remand the case in order to afford the commission an opportunity to fulfill its obligations in a supplementary or additional decision. *United Transit Co.* v. *Nunes*, 99 R. I. 501, 504-05, 209 A.2d 215, 217-18 (1965); *New England Tel. & Tel. Co.* v. *Kennelly*, 81 R. I. 1, 9-10, 98 A.2d 835, 839 (1953).

It is within the framework of these general principles that we examine the commission's decision and order of May 4, 1972.

## TEST PERIOD

In any public utility rate case a first step is the selection of an appropriate test period, that is a span of time (usually twelve months) over which the utility's revenues, expenses, rate base and rate of return may be measured. Inasmuch as performance may, and usually will, vary from year-to-year and indeed from month-to-month, the selection of the test period may well have a substantial effect on the return eventually authorized.

In this case the company, recognizing that rate-making calls for the establishment of tomorrow's rates based upon today's facts, attempted to furnish data relating to its most recent financial experiences in the expectation, or at least the hope, that their use might better protect its interests against the impact of an inflationary economy. To that end it proposed to make the calendar year 1971 the test period. Although it did not then have available actual figures for the full twelve months of that year, it annual-

ized those it had for the eight months ending August 31, 1971 by multiplying them by 1.5. Alternatively, it suggested that the test period include only its actual figures for the eight months ending August 31, 1971.

The commission found both of the company's proposals unacceptable: the annualized period because it used figures which, even if substantially correct, were nonetheless hypothetical and projections of actuals; and the eight-month period because it failed to provide figures for a time interval "* * * sufficiently long to overcome cyclical effects and permit reasonable assurance of reliability for rate-making purposes." In their stead it chose figures for the twelve-month period ending August 31, 1971. Initially requested by the council, they were produced in response to a commission directive and were then selected by the latter "* * * as the most appropriate period for which factual data is available * * *."

Basically the company's quarrel with this test period is that the figures are stale, and that it is not as keyed as are its own proposals to an inflationary economy which permitted its rate of return to decrease from the 5.73 per cent earned during the eight-month period ending August 31, 1971 to 5.45 per cent on December 31, 1971. For the commission to disregard those circumstances in the selection of a test period, the company argues, was to pave the way to the establishment of a confiscatory rate structure.

The company's position would require more extensive consideration at this point if the selection of a test period were the only way the commission could have compensated for the erosive effects which the company maintains inflation will exert upon its ability to earn the allowed return. But that is not the case. Other means were available to the commission, and an adjustment to the rate base, the rate of return, or to both would have served the

same purpose. *State* v. *New Jersey Bell Tel. Co.*, 30 N. J. 16, 35-36, 152 A.2d 35, 46 (1959).

In the circumstances we see no reason why the commission should have been compelled to forego its function of picking and choosing between the several available test periods. Perhaps it would have been better advised had it yielded to the company's urgings and selected the proposed annualized test period. Certainly it would have yielded a more current reading. That it might have been preferable does not mean that it was error not to choose it, for what is important, and indeed decisive, in a rate case, is not the methods or formulae utilized in the rate-making process, but whether the end result, irrespective of the formula used, is just and reasonable. If it is, and if it is grounded upon substantial legal evidence, then it is not within the judicial province to interfere. *Federal Power Comm'n* v. *Hope Natural Gas Co.*, 320 U. S. 591, 602-03, 64 S.Ct. 281, 287-88, 88 L.Ed. 333, 344-45 (1944); *Narragansett Electric Co.* v. *Kennelly*, 88 R. I. 56, 71-72, 143 A.2d 709, 718-19 (1958).

The council agrees that the commission properly refused to accept either of the test periods advocated by the company. It does not stop there. Instead, it goes further and argues that use of the figures for the test period selected by the commission is also prohibited inasmuch as they are found only in a company exhibit which was improperly admitted into evidence because not listed with the commission prior to the hearing as required by §39-1-12, as amended.[2] Continuing, the council argues that the record

---

[2] Where material, §39-1-12, as amended by P. L. 1969, ch. 240, sec. 1, reads as follows:

"Prior to the commencement of any formal hearing, the commission may in its discretion direct the parties or their attorneys to appear before it for a conference. At or before such conference the commission may order any party to file * * * all exhibits it intends to use in the hearing * * * with a short statement of the purposes of each exhibit

thus deprived of that exhibit was devoid of any legal evidence which would support a test period acceptable to the commission, and therefore demands the rejection of the company's filing *in toto.*

The flaw in the council's argument is that it ignores that portion of §39-1-12, as amended, which allows even those exhibits which have not been filed with the commission prior to the hearing to be introduced into evidence "in the discretion of the commission." Here the commission exercised that discretion and admitted the company's exhibit at the hearing. The council's contention that the selected test period lacked a legally sufficient evidentiary foundation must therefore be rejected, and consequently so must its further contention that the company's filing be rejected *in toto.*

## OPERATING EXPENSES AND REVENUES

Another essential step in a rate proceeding is to determine the utility's operating revenues and expenses, and then to deduct one from the other in order to arrive at the amount of income available to pay the wages of capital, i.e. interest on debt securities, dividends on stock and additions to surplus. The actual income and expense figures are found in books of account for the test period and are therefore not likely to be disputed. There are often disagreements, however, about whether some of the figures appearing there should be allowed as operating outlays or whether others which do not appear should be included as revenue.

1. *Wage & Fringe Benefits.* — There is such a disagreement in this case. It arises because the company included

---

* * *. After entry of such an order, a party shall not be permitted, except *in the discretion of the commission,* to introduce into evidence in its direct case exhibits which are not filed in accordance with the order." (emphasis added)

in its operating expenses a 12.3 per cent ($1,244,000) annual increase in wage and fringe benefits which it is, and has in fact been, paying to its employees in compliance with a collective bargaining agreement. The commission, purporting to rely upon certain unidentified Presidential Price Commission regulations, refused to allow an increase of more than 5.5 per cent ($568,000) to be claimed as an operating expense.

The company challenges the disallowance by asserting that the Presidential Price Commission has ruled[3] that wage and fringe benefit increases, even though in excess of the 5.5 per cent guideline, are allowable as costs for the purpose of justifying a utility rate increase, provided they are payable under a contract which took effect prior to the price freeze decreed under the Economic Stabilization Act of 1970, as amended. While the rulings cited do not directly support the company's position, they do so at least inferentially.

The council questions the listing of the increases as an operating expense, but on a different ground from that advanced by the commission. Presumably, it was either unable to locate the regulations which the commission relied upon, or having found them, concluded that they were inapposite. In any event it claims that the increase in wage and fringe benefits should not be allowed as an operating expense because it violates Price Commission News Release No. 26, November 29, 1971. That release, where pertinent, permits a utility rate increase — *not* a wage or fringe benefit increase — only if it "reflect[s] productivity gains." While compliance with that guideline may be a precondition to a rate increase, it is not mandated with respect to wage and fringe benefit increases and is without relevance in this proceeding.

---

[3]PCR 1971-3, 36 Fed. Reg. 23661 (1971); PCR 1972-12, 37 Fed. Reg. 764 (1972); PCR 1972-45, 37 Fed. Reg. 3063 (1972).

Thus, the only potentially sound bases for the disallowance of the claimed operating expense are regulations which the commission has not identified. Failure to pinpoint them makes it impossible for us to ascertain with reasonable certainty whether the disallowance is soundly grounded. Moreover, those regulations, even if controlling when the commission acted, may since have been modified or rescinded by the Presidential Proclamation which ended Phase II and inaugurated Phase III of the war against inflation.

In these circumstances our procedure is clear. Instead of searching for the regulations or attempting to ascertain whether they are still pertinent, we remand the case to afford the commission an opportunity to provide us with that information, or, if the circumstances require, to alter its decision and order. *United Transit Co.* v. *Nunes*, 99 R. I. 501, 504-05, 209 A.2d 215, 217-18 (1965); *New England Tel. & Tel. Co.* v. *Kennelly*, 81 R. I. 1, 9-10, 98 A.2d 835, 839 (1953).

*2. Purchases by the Company from Western Electric.*— For many years Western Electric Company (Western) has virtually been the manufacturing department for American Telephone & Telegraph Company (AT&T) affiliates and has supplied them with a major portion of their telephone equipment and supplies. *Smith* v. *Illinois Bell Tel. Co.*, 282 U. S. 133, 153, 51 S.Ct. 65, 70, 75 L.Ed. 255, 265 (1930); *Illinois Bell Tel. Co.* v. *Gilbert*, 3 F.Supp. 595, 602 (N.D. Ill. 1933). The nature of the relationship is such that telephone rate cases often become forums for inquiry into the fairness and reasonableness of Western's profit margin on its sales to those affiliates.

This rate hearing was no exception. Here the company, an AT&T affiliate, in an attempt to prove compliance with the criteria laid down in *Smith* v. *Illinois Bell Tel. Co.*, *supra* at 152-53, 51 S.Ct. at 70, 75 L.Ed. at 265 and in

*Illinois Bell Tel. Co.* v. *Gilbert, supra* at 602-03, and thereby to establish the reasonableness of its profit margin, produced evidence: (1) that a substantial portion of Western's sales to it were priced at about 65 per cent of the general price level for comparable items; (2) that the average profit margin per dollar on its sales was lower than that of many of the fifty largest industrial manufacturers in the country; and (3) that Western's return on its net investment averages 9.4 per cent as compared with 12.1 per cent and 12 per cent average earned by the fifty largest manufacturers and the one hundred and twenty-five largest industrial concerns in the country, respectively.

The council takes issue on whether the profits were reasonable and refers us to the testimony of Robert G. Towers, an expert who appeared on its behalf. In his judgment the company has been overcharged $1,940,145. The council appears to say that he arrived at that figure by deducting so much of Western's profit on its sales to the company during the 14 years since 1957 as exceeded what Western would have earned had its profit margin on those sales been limited to the company's allowable rate of return during the same period. In essence, he seemed to be urging the adoption of the unique California rule that Western is entitled to no greater return on its sales to an affiliate than the latter is entitled to earn on its own operations. *Pacific Tel. & Tel. Co.* v. *Public Utilities Comm'n*, 62 Cal. 2d 634, 661-62, 401 P.2d 353, 370, 44 Cal. Rptr. 1, 18 (1965).

Acknowledging Towers' method as "innovative," the commission nonetheless concluded that there was insufficient basic data to warrant its adoption. It was, however, less tolerant with respect to the company's claim that the prices paid to Western were reasonable. It approached that claim harboring the suspicion that the relationship between Western and the company was designed "to pro-

vide hidden profits" believing that one company was the "alter ego for the other"; convinced that Western enjoyed inherent advantages because it was the "single large supplier" to a "single large market"; and apparently satisfied that there is a similarity between the Bell System and the Soviet system, but unsure "* * * whether the Soviet system was modeled after the Bell System, or whether the Bell System was modeled after the Soviet system."[4]

Having thus unburdened itself concerning the company's relationship with Western, the commission, reiterating a warning issued in an earlier case, announced it was assuming the role of "watchdog agency of the public," and it proceeded, or so it said, to "sink its teeth and fangs" into the company's claim that the prices charged by Western were fair and reasonable. Its bark was worse than its bite, for the only adjustment was to deduct $71,000 from the company's operating expenses. Its sole substantiation for that deduction is found in the two-line plus conclusory statement that "* * * on the basis of what has been presented [that amount] appears to be fair under the circumstances."

Adjustments in rate cases cannot rest on conjecture, and we therefore cannot permit the commission to "roam the unfenced fields of speculation." *St. Louis-San Francisco Ry.* v. *State Corp. Comm'n*, 187 Kan. 23, 27, 353 P.2d 505, 507 (1960). Once again the rubric of *United Transit Co.*

---

[4]We need not inquire whether this expression evidences the detached, neutral attitude that should be expected from "an impartial, independent body" which G. L. 1956 (1969 Reenactment) §39-1-11, as amended, charges with "the duty of rendering independent decisions affecting the public interest and private rights based upon the law and upon the evidence * * * ." While a regulatory body should carefully scrutinize intercompany transactions and relations, the mere existence of those transactions and relationships does not, without more, justify the conclusion that there has been unfairness, exploitation or unconscionable gains. Such a conclusion requires evidence. *Southwestern Bell Tel. Co.* v. *State Corp. Comm'n*, 192 Kan. 39, 83, 386 P.2d 515, 552 (1963); *City of Columbus* v. *Public Utilities Comm'n*, 154 Ohio St. 107, 114, 93 N.E.2d 693, 698 (1950).

v. *Nunes, supra,* demands a remand and a supplementary decision.

### *RATE BASE*

A utility's rate base represents the total investment in, or the fair value of, the used and useful property which it necessarily devotes to rendering the regulated services. *Narragansett Electric Co.* v. *Kennelly,* 88 R. I. 56, 68-70, 143 A.2d 709, 717-18 (1958); *cf. Public Utilities Comm'n* v. *East Providence Water Co.,* 48 R. I. 376, 380-81, 136 A. 447, 449 (1927). That figure when multiplied by the rate of return produces the allowed return which under traditional rate-making techniques[5] a utility must be afforded the opportunity to achieve. In this case the rate base was valued by the company at $175,534,000, and by the commission at $148,089,000. The difference occurs, in substantial part, because of disagreements concerning what formula should have been employed in computing the company's investment in plant and what items were properly includable in the rate base.

1. *Average vs. End-of-Period Rate Base.* — Usually the largest single item in a utility's rate base is its investment in plant. Customarily it is valued either by averaging investment at the beginning and at the end of the test period,

---

[5]The necessity for ascertaining the rate base in a rate hearing is questioned in the comment found at 1 Priest, *Principles of Public Utility Regulation* 139 (1969):

"It is suggested from time to time that the conventional step of establishing a rate base should be eliminated. According to several students of the problem, the ultimate figure to be determined by a regulatory agency when rate relief is sought is what revenue will enable the utility to attract capital. And regulators are urged to proceed directly to that determination. But at least there 'has been no concerted attempt to break away from rate base/rate of return' and it will be assumed, for the purposes of this discussion, that the rate base technique will be with us for a great while."

or by using an end-of-test period base.[6] *See Narragansett Electric Co.* v. *Kennelly, supra* at 72, 143 A.2d at 719.

In this case the company advocated an end-of-period formula on the ground that its use, particularly if applied to the proposed annualized test period, would take better account of and more accurately reflect its constantly increasing operating expenses, the abnormally high costs of a continuing expansion of its plant, and the impact of an extended inflationary spiral upon its remaining operations.

The commission was not persuaded. It applied the averaging formula because in its judgment the end-of-period approach overstated the company's investment used in producing revenue during the test period and permitted a return on investment which had not actually been in service until the end of the period.

---

[6]The difference in result, depending on which formula is applied, are portrayed in the commission's tabulation which reads as follows:

"New England Telephone & Telegraph Company
Composition of Intrastate Rate Base
(000 Omitted)

|  | Per Company (Year End) | Per Commission (Average) |
|---|---|---|
| Plant in Service | 212,538 | 197,938 |
| Plant under Construction | 10,499 | — |
| Property Held for Future Use | 39 | 815 |
| Gross Plant | 223,076 | 198,753 |
| Reserve for Depreciation | 55,523 | 54,697 |
| Net Utility Plant | 167,553 | 144,056 |
| Working Capital | 7,981 | 4,814 |
|  | 175,534 | 148.870 |
| Less: |  |  |
| Customer Deposits | — | 367 |
| Accumulated Deferred Taxes | — | 414 |
| Total Rate Base | 175,534 | 148 089" |

While the reasons advanced by the commission to support its selection of a formula are hardly responsive to the company's countervailing arguments, the question for us at this point is not which of the two formulae is better adapted to meeting the problems alluded to by the company, but whether the company has made a convincing showing that the commission's valuation was unreasonable, or that its utilization of the averaging formula will necessarily produce an unjust and unreasonable end result.[7] This it has not done inasmuch as the commission was not dependent upon a particular formula for avoiding the fears and forebodings which motivated the company's advocacy of an end-of-period rate base.[8] *State* v. *New Jersey Bell Tel. Co.*, 30 N. J. 16, 35-36, 152 A.2d 35, 46 (1959). Accordingly, we decline to second guess the commission on its selection. *Federal Power Comm'n* v. *Hope Natural Gas Co.*, 320 U. S. 591, 602-03, 64 S.Ct. 281, 287-88, 88 L.Ed. 333, 344-45 (1944); *Narragansett Electric Co.* v. *Kennelly*, 88 R. I. 56, 71-72, 143 A.2d 709, 718-19 (1958).

2. *Working Capital.* — "Cash working capital ordinarily is the amount of cash required to operate a utility during the interim between the rendition of service and the receipt of payment therefor. It is the blood stream that gives life to the physical plant and facilities of the enterprise." *Pitts-*

---

[7]Some courts, while recognizing the advantages of utilization of the averaging formula in a stable economy, find it unsuitable in periods of abnormal expenses and rising costs such as we have been experiencing in recent times. *North Carolina ex rel. Utilities Comm'n* v. *Piedmont Natural Gas Co.*, 254 N. C. 536, 551-52, 119 S.E.2d 469, 480 (1961); *Board of Supervisors* v. *Virginia Electric & Power Co.*, 196 Va. 1102, 1121-22, 87 S.E.2d 139, 150-51 (1955). Priest, commenting on the same problem, says that a utility providing unusual expansion is "entitled to arithmetical computations as current as the circumstances permit." 1 Priest, *supra* at 182.

[8]This matter was also referred to in our discussion of the "test period," and will be considered in greater detail under the heading "rate of return."

*burg* v. *Pennsylvania Public Utility Comm'n*, 370 Pa. 305, 309, 88 A.2d 59, 61 (1952). The interim period is known in the industry as the "lag."

The company in this case presented evidence showing that, on the average, it did not receive payment for its services until 64.65 days after rendition. It estimated that the amount of cash working capital required to meet operating expenses during that lag is $7,981,000 and included that amount in the rate base.

The commission rejected the company's estimate without identifying any contradictory or impeaching evidence. Instead, the action is bottomed solely on its long standing practice of allowing a utility to compensate for the lag by including in the rate base cash working capital equal to, but not in excess of, 45 days of operating expenses. In this case that lag translates into a cash working capital allowance of $4,814,000, and the commission included that figure, rather than the one supplied by the company, in the rate base.

The commission's conclusion is unacceptable. Legal evidence, rather than a "rule of thumb," is the probative indicator of working capital requirements, and the commission, when it selected a 45 day lag for no other reason than because it had followed that practice in some other case or cases on different facts, deprived itself "* * * of the freedom to decide what was a just and reasonable * * * [result] base[d] on the facts in evidence before [it]." That freedom is "important and indeed necessary to do justice." *Narragansett Electric Co.* v. *Kennelly, supra* at 73, 143 A.2d at 719.

In these circumstances we do not determine what should be the allowable amount of cash working capital. That is fact-finding, a responsibility of the commission which should be discharged in a supplementary decision. *United Transit*

*Co.* v. *Nunes; New England Tel. & Tel. Co.* v. *Kennelly,* both *supra.*

3. *Property Held for Future Use.* — The company included $39,000 of property designated "for [f]uture [u]se" in its rate base and the commission upped that figure to $815,000. The council asserts that there is no evidence whatsoever in the record that property of that value was either used or useful in the sense that it was intended to "go into service during the test year or in the imminent future," and was therefore entitled to be included in the rate base.

We agree with the council not necessarily because we have reason to believe that it is correct in its assertions, but because nothing in the commission's decision directly or by reasonable implication informs us of its factual bases or the legal reasons for including property of that kind and value in the rate base.

Once again, instead of speculating about those bases and reasons, we remand to the commission for clarification and amplification. *United Transit Co.* v. *Nunes; New England Tel. & Tel. Co.* v. *Kennelly,* both *supra.*

4. *Unamortized Investment Tax Credits of $1,856,028.* —The council equates an unamortized investment tax credit of $1,856,028 with advance deposits made by customers and accumulated deferred taxes, and argues that the commission, which excluded the deposits and taxes from the rate base, should similarly have excluded the credits or at least identified its reasons for including one and not the others.

It may be that state regulatory agencies differ widely in how they treat investment tax credits for rate-making and accounting purposes, 1 Priest, *supra* at 137-38, but that is hardly a sufficient reason for the commission to act without stating its reasons, or for us to ignore that failure. Once again, therefore, we must remand to afford it the opportunity to do what it should have done and tell us factually

and legally why it allowed the company to include that investment tax credit of $1,856,028 in its rate base. *United Transit Co.* v. *Nunes; New England Tel. & Tel. Co.* v. *Kennelly*, both *supra.*

5. *Separations Procedure.* — A' proper determination of a utility's intrastate rate structure requires separation of its intrastate from its interstate business. This is generally accomplished by the use of a formula which allocates revenues, expenses, and investment in plant and equipment between the two types of service.

In this case the company and the council each advocated a formula. The one suggested by the company, although prescribed by the Federal Communications Commission (FCC) and accepted by the utility regulatory agency in each of the other states, was rejected by the commission as unfair to Rhode Island subscribers. The other, proposed by the council, is an "* * * application of a formula developed by the National Association of Regulatory Utility Commissioners (NARUC)," and nothing in the commission's decision discloses whether or not it was found acceptable. Notwithstanding the availability of these two formulae, the commission apparently turned to a third. It is not identified and, as far as we are able to ascertain, lacks an evidentiary foundation. Nonetheless, the commission used it, and after a "full consideration of all the evidence," decided to disallow $35,000 of the company's claimed operating expenses.

The council argues that the commission, having refused to accept the FCC formula, should have proceeded with the separation on the basis of the NARUC formula because its utilization would have resulted in a substantial reduction in the rate base as well as in the disallowance of $35,000 in operating expenses. Not to adopt it, the council concludes, produced a result which was "internally inconsistent," and therefore unlawful and arbitrary.

The council's argument may well have merit, but the

commission's failure to provide an ample decisional demonstration of the evidential and legal grounds upon which its conclusion is based makes it impossible for us to determine whether it correctly disclaimed the FCC formula, whether its conclusion was, or could have been, based upon the NARUC formula, or whether there was evidence which either warranted the adjustment made or required an additional adjustment. Our inability to make those determinations does not mean they go unanswered, but only that their resolution will be deferred until made by the commission in the supplementary decision which it will be directed to file. *Nunes* v. *United Transit Co.; New England Tel. & Tel. Co.* v. *Kennelly* both *supra*.

## RATE OF RETURN

1. *General.* — Once a utility's revenues, operating expenses and rate base have been ascertained, all that remains in the rate-making process, other than the actual fixing of the rates, is the establishment of an allowable rate of return, that is, the percentage by which a utility's rate base is multiplied in order to determine the revenues needed to pay expenses and to acquire investment capital. That rate must be reasonable and just, and, if new applications are not to follow closely on the heels of their predecessors, must, particularly in a period of rising prices, be prospective in attitude looking to the immediate future as well as to the moment. *New England Tel. & Tel. Co.* v. *Kennelly,* 78 R. I. 211, 219-20, 80 A.2d 891, 894-95 (1951).

The criteria for determining whether the rate of return is just and reasonable are found in the *Hope*[9] and *Bluefield*[10] cases. *Narragansett Electric Co.* v. *Kennelly,* 88 R. I. 56, 83-84, 143 A.2d 709, 725 (1958).

[9]*FPC* v. *Hope Natural Gas Co.,* 320 U. S. 591, 602-03, 64 S.Ct. 281, 287-88, 88 L.Ed. 333, 344-45 (1944).

[10]*Bluefield Water Works & Imp. Co.* v. *Public Serv. Comm'n,* 262 U. S. 679, 692-93, 43 S.Ct. 675, 679, 67 L.Ed. 1176, 1182-83 (1923).

While those criteria do not entitle a public utility to claim the kind of benefits that may be realized in a highly profitable enterprise or in a speculative venture, they do permit an opportunity to earn a return on the value of the property employed for the public convenience equal to the returns generally achieved at the same time and in the same general part of the country on investments in other enterprises having corresponding risks and uncertainties. That return, moreover, should be sufficient to permit the utility "* * * to maintain financial integrity, attract necessary capital, and fairly compensate [its] investors for the risks they have assumed, and yet provide appropriate protection to the relevant public interests, both existing and foreseeable." *Permian Basin Area Rate Cases,* 390 U. S. 747, 792, 88 S.Ct. 1344, 1373, 20 L.Ed.2d 312, 350 (1968).

Here, evidence of what would constitute a just and reasonable rate of return came from four expert witnesses all of whom the commission acknowledged as "qualified and experienced men in their respective fields of economics." The three called by the company were: — (1) its own general financial supervisor of research; (2) a university professor of finance; and (3) an economist and public utility consultant for a nationally known investment brokerage house. The fourth witness, David A. Kosh, was engaged by the Public Utilities Administrator.[11] Each took the traditional four steps in arriving at a rate of return:

(1) Determined a debt to equity ratio, viz., what share of the company's capital should be in fixed yield indebtednesses and what share in equities;

(2) Calculated the cost of debt financing, an exercise which, at least in the absence of sharply fluctuating interest rates, can be performed with some accuracy;

---

[11]The chairman of the commission, by virtue of that office, holds the title of Public Utilities Administrator. General Laws 1956 (1969 Reenactment) §39-1-3, as amended by P. L. 1969, ch. 240, sec. 1.

(3) Estimated the cost of equity or risk capital, a judgmental procedure requiring

"(a) examination of recent issues (prices, terms and conditions acceptable to investors yesterday),

(b) a hard look at the future to decide what must be offered investors tomorrow,

(c) fairness to existing or 'captive' stockholders obviously concerned about the possible dilution of dividends and values per share and

(d) maintenance of the utility's financial integrity generally." 1 Priest, *supra* at 209-10; and

(4) Applied the three figures thus determined, in order to arrive at a rate of return, i.e. a composite cost of capital.

Their findings were tabulated by the commission as follows:

| | | *"Assumed Debt/Equity Ratio* | *Cost of Debt* | *Cost of Equity* | *Composite Cost of Capital* |
|---|---|---|---|---|---|
| John H. Cogswell: | | 45/55 | 6.2% | 12-13% | 9.5-10.0% |
| Robert S. Stich: | | 42.5/57.5 | 6.17% | 12-12.2% | 9.5-9.6% |
| C. Austin Barker: | | 44.5/55.5 | 6.2% | 12.6% | 9.75% |
| David A. Kosh: | (1) | 50/50 | 6.2% | 10.5-11% | 8.35-8.6% |
| | (2) | 50.5/49.5 | 6.3% | 10.5-11% | 8.38-8.62% |
| Notes: | (1) | Based on Bell System Figures. | | | |
| | (2) | Based on Company's estimated actual debt and capital structure, 1972." | | | |

The tabulation makes clear that the experts, while substantially in agreement on the cost of debt, differed sharply with respect to the assumed debt/equity ratio, the cost of equity capital and the rate of return (composite cost of capital).

After attributing the experts' differences to "the old adage that rate making is not a precision science," rather than to lack of expertise or prejudice, the commission found Kosh's testimony most attuned to its own philosophy. Then, coupling his testimony with its own forecast of this

state's future economic climate, it adopted his recommendation that 8.38 per cent was a "fair and reasonable" rate of return, and one that "* * * would provide adequate interest coverage and enable the Company to finance its continuing need for new funds efficiently."

Kosh arrived at the 8.38 per cent figure by utilizing "the DCF method." While that method appears to us to be complex and abstruse, the commission evidently felt otherwise, for, without any factual elucidation whatsoever, it concluded that the DCF formula provided "* * * a logical and realistic approach to the determination of the cost of equity," avoided "the subjective appraisal of what investors should seek" and "* * * analyz[ed] the market experience of companies of similar risk as prescribed by the *Bluefield* and *Hope* cases [in order to determine] what the equity investor in fact seeks and will accept."

Whether a rate of return so determined is reasonable and just is not susceptible to a simple solution. Reasonableness is a relative term which varies with the circumstances and the facts in each case. *Narragansett Electric Co.* v. *Kennelly, supra* at 84, 143 A.2d at 725. Presumptively, however, it is reasonable, and will not be interfered with unless the company, in asserting the contrary, satisfies us by clear and convincing evidence that it is clearly, palpably and grossly unreasonable. *Id.; Town of Middletown* v. *Newport Water Corp.,* 53 R. I. 435, 438, 167 A. 114, 115 (1933).

In attempting to meet that heavy burden, the company argues initially that Kosh, throughout his *oral* testimony, referred to 8.60 per cent and not to 8.38 per cent, as being the "fair rate of return." While that may be so, it is also so that the exhibit prepared by Kosh and filed with the commission listed 8.38 per cent at the lower end of the range of acceptable returns. Under our rule the commission, as sole factfinder in the case, was free to pick and

choose even between inconsistent portions of Kosh's testimony. *Accord, Madeira* v. *Pawtucket Housing Authority,* 105 R. I. 511, 515, 253 A.2d 237, 239 (1969); *Russian* v. *Lipet,* 103 R. I. 461, 464-65, 238 A.2d 369, 371-72 (1968).

The company also argues that we should follow *New England Tel. & Tel. Co.* v. *Dept. of Public Utilities,* Mass., 275 N.E.2d 493 (1971), where the court set aside the rate of return which the state regulatory body had established in reliance on the testimony of the same witness Kosh who testified in this case. Among the court's reasons were: (1) that Kosh was a "professional witness" who, with few exceptions, appeared in public utility rate cases on behalf of regulatory agencies or commissions;[12] and, (2) that the regulatory body was in the "anomalous position" of having called him as a witness of its own choice to testify concerning the very facts which it was required to find. That position, the court said, was "* * * no less anomalous by reason of the fact it did not result from any fault of the [d]epartment but was created by applicable statutes." *Id.* at, 275 N.E.2d at 513.

We can appreciate the appeal that the Massachusetts court's approach has for the company, but the court relied upon something more than the anomaly of a "professional witness" being called by the factfinder as its rationale for finding that the administratively established rate of return was unreasonable.

In this case the company believes that the "something

---

[12]Responding to this argument the commission, which earlier in its decision ascribed the differences in the opinions of the experts to the adage that "rate making is not a precision science," here commented that "[i]n weighing the judgments of the expert witnesses. the [C]ommission must take into consideration the fact that an expert witness's thinking is likely to be colored to favor the position of his employer. It is fortunate that in Rhode Island, the expert engaged and answerable to the [A]dministrator of the [D]ivision must appear before a three member commission of which the [A]dministrator is only one."

more" is the commission's refusal to give due consideration to the attrition which the company claims was responsible for its inability to earn a just and reasonable rate of return during the slightly more than two years which have intervened since its last rate increase. It argues that the same result will obtain in the continuing inflationary cycle which it foresees unless the commission authorizes a larger rate of return than 8.38 per cent, selects an annualized test period, employs an end-of-period rate base, or adopts some other workable method of its own choice. *See State* v. *New Jersey Bell Tel. Co.*, 30 N. J. 16, 35-36, 152 A.2d 35, 46 (1959).[13]

The council, assuming arguendo that the erosive effects anticipated by the company will occur, asserts that efficiency of management, operating economies and technological improvements will offset them. As far as we are advised, however, it did not pinpoint the efficiencies of economies or improvements which have, or may become available for that purpose, and this omission leaves the record barren of any evidence upon which to bottom the finding which the council urges.

The commission took a different tack. Apparently rely-

---

[13]Referring to the *New Jersey Bell* decision, 1 Priest, *supra* at 205-06 says:

"In a 1959 decision, the New Jersey Supreme Court said that, in handling attrition, 'the method most generally followed is to increase the otherwise allowable rate of return'; that increasing rates of return to adjust for attrition, or 'raising the otherwise allowable rate base, are equivalents and the board may do either'; that some commissions 'have simply utilized . . . year-end rate base calculations'; that others have combined an end-of-period rate base with an increase in rate of return; and that others 'have adjusted an original-cost rate base by a figure representing the excess of new investment in a period beyond the test year over what such investment would have been if it were constructed at the same average cost as existing plant'. The court added that New Jersey's board was free to accept or reject one or another of these techniques or 'adopt any other formula' as it saw fit."

ing upon its own knowledge rather than upon the expertise of others, it forecast that wage and price controls, tax benefits for businesses and consumers, the changing value of the dollar relative to other currencies, and the breakdown of trade barriers will bring about a dampening of inflationary trends and an improved economic condition. These factors, it surmises, will produce lower interest rates, higher prices for utility stocks and substantially increasing profits for utility companies.

We need not engage in conjectural emendation to ascertain whether the commission has accurately predicted the future of the economy. The company's actual operating experience during the period of almost a year which has elapsed since the prophecies were made provide a truer measuring stick against which to check them. *New York Tel. Co.* v. *Public Service Comm'n,* 29 N.Y.2d 164, 169-71, 272 N.E.2d 554, 556-57, 324 N.Y.S.2d 53, 55-56 (1971); *Boston Gas Co.* v. *Dept. of Pub. Utilities,* Mass. , 269 N.E.2d 248, 257-59, 263 (1971). *See, Lindheimer* v. *Illinois Bell Tel. Co.,* 292 U. S. 151, 163-64, 54 S.Ct. 658, 663, 78 L.Ed. 1182, 1191 (1934).

Inasmuch as the commission must in any event reconsider its decision, it can as part of that reconsideration compare the company's actual rate of return since that decision with its earlier prognostications. It will then be in a position to make suitable adjustments which can reflect whatever erosive trends may be disclosed.

## RATE STRUCTURE

After the commission fixed a new rate of return, its next and final step was to authorize the company to file a new rate schedule structured to afford it an opportunity to

achieve $7,989,000 in additional revenue.[14] We now direct our attention to some of the preconditions which the commission has decreed that the new tariff must satisfy.

1. *Value of Service vs. Direct Cost.* — One problem is whether any new tariff filed by the company should be based upon the actual cost of each type of service provided, or whether instead the company should be permitted to adhere to its long standing practice of basing a tariff upon the relative value of service approach to rate making.

More than two years prior to this hearing the commission in *New England Tel. & Tel. Co.,* Docket No. 1024 (Jan. 30 and Feb. 10, 1970) found that the "value of service" approach was unreasonable. Consequently, it directed the company to " '* * * embark upon a program of accurately determining its actual cost of providing service * * *' " and to come forward within twelve months with a complete summary of its revenue, cost and plant data with respect to each of its tariff offerings.

While that directive was subsequently relaxed when it was learned that the problems incident to its execution were "more—far reaching" than originally contemplated, the commission does not now deem that relaxation sufficiently latitudinous to excuse the company from accompanying its current application with some tangible evidence of an effort

---

[14]The following schedule demonstrates how the commission arrived at this figure:

"Net Revenue Required

|  | (000 Omitted) |
|---|---|
| (8.35% x Rate Base $148,089.) | $12,409 |
| Pro-Forma Income | 8,625 |
| Additional Net Income Required | 3,784 |
| Federal Income Taxes | 3,493 |
| R. I. Gross Receipts Tax | 633 |
| License Fee Increase | 80 |
| Additional Gross Revenue Required | $ 7,989." |

to compile actual cost of service figures. The lack of those figures and the consequent necessity of placing reliance on the "informed judgments" of company witnesses concerning the "value of service," the commission continued, made it impossible for it "*' * * to determine whether the proposed rates are in fact fair and reasonable."

While we are unable to square the above statement with the commission's subsequent authorization to file a new tariff designed to produce almost $8,000,000 in additional revenue, the council does not make the attempt. Rather, reading the commission's statement literally, it concludes that the record contains no legal basis for authorizing the filing of a revised rate structure.

To accept that conclusion and insist that the commission now commit itself to a future rejection *in toto* of any rate schedule which may be filed by the company is more drastic relief than we are willing to grant in a case which, for other reasons, will require a supplementary decision. That decision will afford the commission an opportunity to clarify and expand on the reasons previously given for finding the "value of service" approach legally unacceptable.

2. *Rates for the Hopkinton-Richmond Area.* — The commission found that the "* * * service provided to subscribers in the Hopkinton and Richmond area is not adequate, efficient or sufficient * * *" and it barred the company, pending improvement in that service, from increasing the rates charged to subscribers in that area.

The difficulty with the commission's finding is that it is premised upon "information" which apparently came to the administrator's attention at a meeting of the Richmond Town Council at which dissatisfied customers complained of "inadequacies in central office equipment and trunking" and "insufficient maintenance of the cables."

Obviously, that kind of "information," is not legally pro-

bative in proceedings under the Administrative Procedures Act. That act in §42-35-9(g) provides that "[f]indings of fact shall be based *exclusively* on the evidence and matters officially noticed." (emphasis added) Here, there was no evidence of inadequate service other than that contained in the administrator's recitation of complaints voiced by irate customers at a town council meeting and that recital did not qualify as legal evidence. Neither were the complaints "judicially cognizable" and thus entitled to official notice under §42-35-10(d).[15] There was, therefore, no legal basis for so much of the commission's order as relates to rate increases for subscribers in the Hopkinton-Richmond area and that part of the order cannot be allowed to stand.

3. *Special Rates for the Elderly.* — In the commission's view a utility which bases its charges upon a "value of service" theory should adjust its rates "* * * between classes of its customers in a manner which reflects [its] social responsibility to the community from which it derives its revenues * * *." Consequently, it directed the company to include in any new tariff a $1.00 per month discount for certain persons 65 years of age or over.

The commission purports to find authority for that order in *United Transit Co.* v. *Nunes, supra* at 513-14, 209 A.2d at 222. There, to be sure, we recognized management's right under certain conditions to classify as an operating expense

---

[15]Section 42-35-10 in pertinent part provides:

"42-35-10. Rules of evidence—Official notice.—In contested cases:
* * *

(d) notice may be taken of judicially cognizable facts. In addition, notice may be taken of generally recognized technical or scientific facts within the agency's specialized knowledge; but parties shall be notified either before or during the hearing, or by reference in preliminary reports or otherwise, of the material noticed, including any staff memoranda or data, and they shall be afforded an opportunity to contest the material so noticed. The agency's experience, technical competence, and specialized knowledge may be utilized in the evaluation of the evidence."

a gift in a modest amount to a certain type of charitable organization. We did not, however, authorize the commis-- sion to invade management's province by directing a utility to make a charitable contribution. Thus, even were we to equate service at reduced rates for the elderly with a charitable contribution, *Nunes* would not be authority for the commission to compel the company to provide special rates for particular categories of subscribers.

Neither can we find any authority for the commission's order in §§39-2-2, 39-2-3, or 39-2-5, as amended. While those sections generally prohibit preferential treatment to utility customers, they do, by way of exception, authorize the division to permit a utility to offer "free or reduced rate service" to an elderly person. But the authority to grant that limited exception does not carry with it the power to compel a utility to afford a reduced rate to senior citizens. Under the statutes the initiative rests with the utility, and the commission cannot, unless so authorized by the Legislature, compel its exercise. *New England Tel. & Tel. Co.* v. *City of Brockton*, 332 Mass. 662, 669-70, 127 N.E.2d 301, 305 (1955).

## CONCLUSION

In each case the records certified to this court are ordered returned to the commission. It should reconsider the testimony in the present record supplemented by such further testimony as may be offered pursuant to the petition of any party or by its own direction, and it should then make further findings and orders in harmony with this opinion. Any party thereafter dissatisfied may, by motion filed in this court within 20 days following the commission's action, bring the matter before us for further consideration. In that event it will be set down for argument upon the briefs now before us and upon such supplemental record and briefs as may be required. Jurisdiction for the review

of the commission's supplementary decision and amended order is retained in this court.

Mr. Chief Justice Roberts did not participate.

Mr. Justice Powers participated in the decision but retired prior to its announcement. Mr. Justice Doris did not participate. ·

Attorneys for Petitioners:

*Roberts & Willey Incorporated, Dennis J. Roberts, II, David W. Carroll,* for Rhode Island Consumers' Council.

*Tillinghast, Collins & Graham, Andrew A. DiPrete, Peter J. McGinn, Sullivan & Worcester, Robert G. Bleakney, Jr.,* of Boston, Mass., for New England Telephone and Telegraph Company.

*Kenneth F. MacIver, Jr.,* Rhode Island Legal Services, Inc., for Senior Citizens of Rhode Island Action Group.

*Archie Smith,* Public Utilities Commissioner, for respondents.