396 A.2d 102.

BLACKSTONE VALLEY CHAMBER OF COMMERCE *et al.* *vs.* PUBLIC UTILITIES COMMISSION.

JANUARY 5, 1979.

PRESENT: Bevilacqua, C.J., Joslin, Kelleher, Doris and Weisberger, JJ.

WEISBERGER, J. These are two statutory petitions for certiorari[1] which have been consolidated pursuant to a motion by the petitioners and which have the effect of challenging a rate design mandated by the Public Utilities Commission (the commission).

Initially Blackstone Valley Electric Company (Blackstone) filed with the commission certain revised rate schedules intended to raise its revenue by $2,100,000 (later apparently revised to $2,700,000). The new rate schedules included a fuel adjustment clause designed to return to Blackstone the cost of fossil fuel used in generating power. The commission suspended the effective dates of the proposed schedules and proceeded to hold hearings beginning in December 1975 and extending to February 1976. As a result of the hearings, on February 18, 1976, the commission issued Order No. 9122, allowing Blackstone to file new rates which would recover revenues in the amount of $1,454,202. The order also stated that the increase in rates would not be applied to the first 300 kilowatt hours (KWH) of electricity consumed per month by residential customers. Thereafter, on March 2, 1976, the commission issued its report incorporating therein Order No. 9122 and findings contained in said order by reference. From this order and report Blackstone, along with certain chambers of commerce (Blackstone Valley, Greater Woonsocket

---

[1] At the time of filing, the pertinent statute was P.L. 1973, ch. 199, §4, now G.L. 1956 (1977 Reenactment) §39-5-1.

and Greater Providence), sought review by statutory petitions for writs of certiorari.

Subsequent to March 2, 1976, Blackstone discovered certain significant errors in its calculations of exhibits filed in support of the rate increase authorized by Order No. 9122 and filed a motion to suspend the order pending clarification of the underlying data. The motion was granted by the commission. Blackstone also filed a motion to reopen the hearings for reconsideration of the findings relative to the new fuel adjustment clause. As a result of correspondence and an opinion from the Attorney General, the request of Blackstone was treated as a new request for a filing of revised rate schedules. A series of additional hearings resulting in a comprehensive further investigation into Blackstone's rate structure began on June 15, 1976, and continued on various dates in July of 1976. The chambers of commerce participated in these hearings as intervenors. They, along with Blackstone, withdrew their petitions for certiorari then pending in this court.

On September 1, 1976, the commission issued Order No. 9215 which incorporated its Order No. 9122 and its Report and Order of March 2, 1976 by reference, and adopted all findings and conclusions therein contained. This order instructed Blackstone to file new rates and charges which would recover revenues in the amount of $2,044,028, of which sum an amount of $791,744 was said to be an increase in test-year revenues. The commission further ordered that the increase in rates was not be applied to the first 300 KWH of electricity consumed per month by residential users. On September 15, 1976, Blackstone filed revised tariffs in accordance with Order No. 9215, and said tariffs were approved by Order No. 9222 of the commission dated September 16, 1976. From each of these orders Blackstone Valley Chamber of Commerce, Greater Woonsocket Chamber of Commerce and the Greater Providence Chamber of Commerce (chambers of commerce) petitioned for certiorari. Both petitions challenge only the exemption of residential users

from the rate increase and do not question the validity of the determination of the additional revenues approved by the commission.

The chambers of commerce contend that the exception of the first 300 KWH from the increased rate schedule is unreasonable and discriminatory. They further contend that there is no substantial evidence in the record to support this exemption. The Attorney General on behalf of the Division of Public Utilities and Carriers (the division) argues that in rate setting, the commission is in effect exercising a legislative function, and the result of the exercise of this function can only be set aside by a showing by petitioners through clear and convincing evidence that the commission exceeded its authority or acted illegally, arbitrarily or unreasonably.

Whatever may be the rule in other jurisdictions, we have held that pursuant to G.L. 1956 (1977 Reenactment) §§39-1-3 and 39-1-11, "the commission is required to determine and to adjudicate matters before it as an impartial and independent quasi-judicial tribunal." *Narragansett Electric Co.* v. *Harsch,* 117 R.I. 395, 368 A.2d 1194, 1201 (1977). We further stated in that case that the commission is defined as an " 'impartial, independent body' which renders decisions affecting both the public interest *and private rights* based upon the law and evidence * * *." *Id.* at 403, 368 A.2d at 1200. Earlier in *Rhode Island Consumers' Council* v. *Smith,* 111 R.I. 271, 302, 302 A.2d 757, 775 (1973), we held that the commission was not authorized by §§39-2-2, -3 or -5 to mandate preferential rates to elderly persons. We observed:

> "While those sections generally prohibit preferential treatment to utility customers, they do, by way of exception, authorize the division to permit a utility to offer 'free or reduced rate service' to an elderly person. But the authority to grant that limited exception does not carry with it the power to compel a utility to afford a reduced rate to senior citizens. Under the statutes the initiative rests with the utility, and the commission

cannot, unless so authorized by the Legislature, compel its exercise."

Most recently in *United States v. Public Utilities Commission,* 120 R.I. 959, 393 A.2d 1092 (1978), we enunciated certain principles concerning rate design. We stated that the burden is on a utility which seeks an increase in rates to establish not only that it requires an overall increase, but that its proposed schedule of rates is nondiscriminatory. We also pointed out that where the increase is spread proportionately across the board among several customer classes, a presumption arises that the new rates are reasonable and nondiscriminatory. The rationale for this presumption is that the agency has previously approved the general rates upon which identical percentage increases are superimposed. No such presumption arises in favor of an increase which is imposed upon some classes of customers and not upon others.

Indeed, the rates as originally filed by Blackstone were to be implemented by across-the-board proportional increases among various customer classes, including the residential class now exempt.

The commission in mandating that the first 300 KWH used per month by residential customers be exempt from the scheduled increases based its determination not on the request of Blackstone, but upon statements by various witnesses who were really seeking a "lifeline rate" which would have been designed for the benefit of elderly or poor residential users. As already noted, such a rate could not have been imposed as to elderly customers unless the initiative were taken by Blackstone rather than the commission. *Rhode Island Consumers' Council v. Smith, supra.* Moreover, this court in *Narragansett Electric Co. v. Harsch, supra,* quoted with approval observations of the Supreme Court of Washington in *State ex rel. Puget Sound Power & Light Co. v. Department of Public Works,* 179 Wash. 461, 468, 38 P.2d 350, 353 (1934), in which the court asserted that "public service companies are not eleemosynary institutions, and

they cannot be compelled to devote their property to a public use except upon the well-recognized basis of a fair and reasonable return therefor. Through general taxation only, in common with all taxpayers, can they be compelled to contribute to the relief of the distressed." Further, in *Narragansett Electric Co.* v. *Harsch, supra* at 429, 368 A.2d at 1213, we stated:

> "We agree with these principles and hold that, in this case, the commission has erred in relying upon the ability of consumers to pay for services in setting a cost of equity."

Only a slight extension of this principle is required to determine that the customers of a public utility engaged in commercial, industrial and nonresidential enterprise are similarly not eleemosynary institutions. These customers cannot be compelled to devote their property in the form of utility payments for the benefit of those deemed worthy by the commission to be subsidized, particularly in the absence of any specific statutory authority for the commission to mandate such a result. In view of our past decisions, utility rate design is susceptible only to limited social engineering.

The determination of the commission to exempt the first 300 KWH used by residential customers, whether elderly, disadvantaged or affluent, cannot be sustained unless based upon competent evidence relevant to the issue of rate design. The result to be achieved is a just and reasonable rate "without unjust discrimination, undue preferences or advantages," *see* §39-1-1. A restructuring of rates to eliminate or palliate past discrimination or to improve allocation of cost of service would be among the appropriate objectives toward which the commission may exercise its powers in approving rate design.

We have deferred to the fact-finding powers of the commission in accordance with §39-5-3 which enjoins this court from exercising its independent judgment or weighing conflicting evidence. However, it has been the general rule that

while we do not engage in fact-finding, our function is to determine whether the commission's decision and order are lawful and reasonable and whether its findings are fairly and substantially supported by legal evidence and sufficiently specific to enable us to ascertain if the facts upon which they are premised afford a reasonable basis for the result reached. *Rhode Island Consumers' Council* v. *Smith, supra* at 277, 302 A.2d at 762; *Town of Jamestown* v. *Kennelly,* 81 R.I. 177, 180-81, 100 A.2d 649, 651 (1953).

In the instant case, the commission points to no evidence in the record which supports its determination and conclusion that residential users should be exempt as to the first 300 KWH from the increased rate schedules approved. Some reference is made in the order to the "heavy portion of the burden of supporting the Company's revenue requirement" borne by rate payers using a minimum amount of electricity. Report and Order issued March 2, 1976, at 33; Order No. 9122 issued February 18, 1976 at 3.

However, an examination of the record shows that there is no legal or competent evidence to support this conclusion. Various witnesses did testify that utility costs were too high. Indeed, the commission conceded that it had an insufficient evidentiary basis to adopt a lifeline proposal or general rate restructuring in the course of the subject proceedings.

In its Report and Order issued March 2, 1976, the commission made the following observations at 31-32:

> "In summary, neither the Division witness, Dr. Wilson, nor company witnesses made any specific recommendation for a new rate structure which could be subjected to investigation during the course of the hearings. The only specific rate restructuring proposal put forward, in fact, came from several consumers and the Blackstone Valley consumer organization, Coalition for Consumer Justice. This proposal was for a so-called 'lifeline' rate of .03 cents per kilowatt hour for the first 300 kilowatt hours of electricity consumed each month, with the revenue

deficiency produced by such a rate reduction spread throughout other blocks of the Company's rates."

The lifeline rates were rejected by the commission because implementation thereof would require a shifting of more than $4 million from residential customers to other blocks. The commission observed that it could not, without a much more rigorous investigation and analysis, embrace such a sweeping shift in the rate structures.

Moreover, the brief submitted by the Attorney General in support of the commission's determinations included the concession that "the record is virtually barren of any evidence which portrays the cost of service of providing electrical power to the Company's various classes of customers." The commission in its reports and orders points to no evidence in the record upon which it bases the conclusion "that rate-payers using a minimum amount of electricity are carrying a heavy portion of the burden of supporting the Company's revenue requirement." We have stated that when the commission does not point to the evidence upon which it relies to support a conclusion, we shall not search the record in order to determine whether such evidence exists. *Bristol County Water Co.* v. *Public Utilities Commission*, 117 R.I. 89, 99, 363 A.2d 444, 450 (1976); *Rhode Island Consumers' Council* v. *Smith, supra* at 278, 302 A.2d at 763 (1973).

It appeared to be the consensus of all of the expert witnesses that a cost of service study would be necessary in order to develop a revised rate design which would reflect the cost of serving different categories of customers. As a consequence, save for conjecture and assumption, there was no basis to determine that residential customers were bearing an unjust portion of the burden of providing the utility with revenue.[2] Indeed, the commission itself recognized the need

---

[2]Compare *Boston Edison Co.* v. *Department of Public Utilities*, 375 Mass. 1, 375 N.E.2d 305 (1978), where the regulatory agency specifically found that demands of residential customers did not give rise to the need for rate relief which stemmed largely from the utility's construction program. Therefore, the Supreme Judicial Court of Massachusetts held that the department could reasonably conclude, on the

for a continuing rate structure investigation and asserted that in order to implement this investigation, the commission should have the opportunity to explore the company's cost of service figures and relate them to the rate structure. With this expressed intention of the commission this court is in full agreement. Where, as here, it becomes impossible for us to fulfill our assigned function of review properly because of the commission's failure to set forth sufficiently the findings and the evidentiary facts upon which it rests its decision, or the reasons or true bases for its conclusions, we will not speculate thereon nor search the record for such evidence or reasons. Neither will we decide for ourselves what is proper in the circumstances. Instead, we will remand the case in order to afford the commission an opportunity to fulfill its obligations in a supplementary or additional decision. *Rhode Island Consumers' Council* v. *Smith, supra* at 278, 302 A.2d at 763; *United Transit Co.* v. *Nunes,* 99 R.I. 501, 505, 209 A.2d 215, 217-18 (1965); *New England Telephone & Telegraph Co.* v. *Kennelly,* 81 R.I. 1, 9-10, 98 A.2d 835, 839 (1953).

For the reasons set forth above, the records previously certified to this court are ordered returned to the commission. It should reconsider the evidence and the present record, supplemented by such further evidence as may be offered by any party or by its own direction, and it should make further findings and orders regarding rate design not inconsistent with this opinion. Pending such findings and orders, any increases in rates needed to achieve Blackstone's overall authorized increase in revenue shall be prorated across the board among Blackstone's several customer classes.[3]

Any party dissatisfied with the commission's supplementary findings and orders may, by motion filed with this court within 7 days following the commission's action, bring the

record before it, that an exemption of the first 384 KWH from the authorized increase was supported by evidence.

[3]This order is prospective and shall be implemented by the commission within 60 days from the filing of this opinion.

matter before us for further consideration. In that event the case will be set down for further argument based upon the briefs now before us and upon such supplementary briefs as may be required.

Jurisdiction to review the commission's supplementary decision and amended order is retained in this court.

*James F. McCoy,* for petitioners.

*Julius C. Michaelson,* Attorney General, *Gregory L. Benik, W. Kenneth O'Donnell,* Special Assistant Attorneys General, *Mary E. Levesque,* for Intervenor, Coalition for Consumer Justice, for respondent.