### RHODE ISLAND CHAMBER OF COMMERCE FEDERATION

v.

### Edward F. BURKE et al.

### NEWPORT ELECTRIC CORPORATION

v.

### PUBLIC UTILITIES COMMISSION.

### Nos. 80–88–M.P., 80–91–M.P.

Supreme Court of Rhode Island.

April 2, 1982.

James F. McCoy, Pawtucket, for Rhode Island Chamber of Commerce Federation.

Sheffield & Harvey, Brian G. Bardorf, Richard B. Sheffield, Newport, for Newport Elec. Corp.

Dennis J. Roberts II, Atty. Gen., John R. McDermott, Sp. Asst. Atty. Gen., Carl I. Freedman, Rhode Island Legal Services, Inc., Providence, for intervenor, The Coalition for Consumer Justice.

## OPINION

KELLEHER, Justice.

We have consolidated these two statutory petitions for certiorari, which were issued pursuant to the terms of G.L.1956 (1977 Reenactment) § 39–5–1 and seek a review and a quashing of actions taken by the Public Utilities Commission (the commission). The petitions were filed by the Rhode Island Chamber of Commerce Federation (the chamber) and Newport Electric Corporation (Newport). At issue are but two crucial questions: (1) Does the commission have the authority to modify a rate design submitted by a utility, in this instance, Newport? and (2) if the answer is yes, is there an evidentiary basis for the commission's direction for an "intraclass allocation" of the cost of service among Newport's residential customers which gives a lower rate to a portion of the group within the residential class?[1] Although we answer the first question in the affirmative, we conclude that in order for the second question to be resolved properly, the record in this case must be remanded to the commission.

### I

### The Commission's Authority

[1] Newport maintains that rate design is the sole prerogative of the petitioning utility and bases this proposition on our holding in *Blackstone Valley Chamber of Commerce v. Public Utilities Commission*, R.I., 396 A.2d 102 (1979), and *Rhode Island Consumers' Council v. Smith*, 111 R.I. 271, 302 A.2d 757 (1973). In both of those cases, this court invalidated the preferential rates set for the disadvantaged and the elderly which had not been proposed by the utilities

involved. Newport takes nothing by the holdings in each of those cases since the preferential rates imposed by the commission in both instances were not substantiated by cost-related evidence as are the rates in the case at bar.

We have no doubt about the commission's power to formulate a rate design that may differ substantially from that presented by the utility. Back in 1969 when the General Assembly first created the commission, it specifically declared that it was the policy of this state to provide for the "regulation of public utilities * * * in the interest of the public * * * [and] to provide just and reasonable rates and charges * * *." *See* G.L.1956 (1977 Reenactment) § 39–1–1. The Legislature then went on to specify that the provisions of title 39 were to be construed liberally to aid in the implementation of the declared purposes of title 39 and that the commission was to be endowed with all additional implied and incidental powers "which may be proper or necessary" in the discharge of its duties. *See* G.L.1956 (1977 Reenactment) § 39–1–38.

The statutory sentiments to which we have just alluded represent a clear legislative intent to grant the commission broad powers as it seeks to establish a system of rates which will be just and equitable to all concerned including the utility and its customers. To limit the commission's powers, as Newport would have us do, would be to hamstring the effective operation of the rate-making scheme envisioned by the General Assembly. *See Cascade Natural Gas Corp. v. Davis*, 28 Or.App. 621, 560 P.2d 301 (1977), where the commissioner's rate design, which differed from that submitted by the utility, was upheld.

### II

### Rate Design for the Residential Class

The petitioners' second challenge to the residential rates established in the commission's order asserts that the rates are un-

---

1. Newport has various classifications for its clientele, such as residential, commercial, in-

dustrial, and Navy.

supported by the evidence and are discriminatory. The residential rate design—how costs are distributed within the class—was vigorously debated at the commission proceedings, and the rate design that finally emerged was a compromise between proposals from Newport and from the Coalition for Consumer Justice (the coalition). The coalition's plan called for abandoning the declining-block-rate design then in effect and replacing it with an inverted-rate design[2] based on the theory of marginal-cost pricing.

The coalition's chief witness on the issue of rate design was Dr. Eugene Coyle. He began his testimony by questioning the economic soundness of the declining-block-rate design. He explained that this type of rate design, in which cost per kilowatt hour (KWH) decreases as the volume of usage increases, was outdated and economically unjustified. The declining block rate is theoretically based, he said, on the economic principle that such a pricing system induces greater consumption, which in turn leads to larger, more efficient power plants. He indicated, however, that under current economic conditions, new facilities cost more than existing facilities and large customers are no longer cheaper to serve. As an alternative to the declining block rate, Coyle recommended a design based on the theory of marginal-cost pricing. The result, he claimed, would be prices that more accurately reflect the cost of providing service.

"Marginal-cost pricing" is a general term for a theory that sets the price paid for a service at the cost the seller incurs in providing one additional unit of that service. The theory can be implemented in a variety of fashions, but the one Coyle selected was long-run-increment-cost (LRIC) pricing. The distinguishing characteristic of LRIC pricing is that it calculates the cost of service over a relatively long period, ten years in this instance. Thus, LRIC focuses on the cost of providing the additional unit of service while calculating that marginal cost over the long run.

2. Under inverted rates, the price per kilowatt hour (KWH) of electricity increases with the

After laying the theoretical foundation for LRIC pricing, Coyle presented the following rate design for the residential class:

| | |
|---|---|
| First 200 KWHs | $0.048 per KWH |
| Next 500 KWHs | $0.052 per KWH |
| All Additional KWHs | $0.068 per KWH |

The $0.068-per-KWH figure was a computation of LRIC made by another coalition witness. The reason Coyle did not advocate levying the LRIC rate against all residential usage was that this approach would result in windfall profits to the company. Coyle explained why this is so. He noted that in the present economy of rising costs, LRIC is higher than the average cost per KWH (total costs divided by total KWHs). If all KWHs were sold at LRIC, the company would recover an amount that exceeded its costs of providing service. In order to offset the potential windfall to the company, Coyle constructed the above design which affords a rate below LRIC for usage within the first 700 KWHs. With this adjustment made, total revenue from the class would be, in Coyle's estimation, closer to the actual cost of providing service.

Coyle's testimony was rebutted by an expert witness, Dr. John W. Wilson, appearing on behalf of the Division of Public Utilities and Carriers. The brunt of the rebuttal was directed at the LRIC figure Coyle had used. Because the figure took into account anticipated inflation, it produced, Wilson argued, an inaccurately high figure.

In addition to the coalition's proposal, the commission considered a rate design submitted by Newport at the commission's request. The rate design incorporated a customer charge of $4 per month and set the following rates:

| | |
|---|---|
| First 300 KWHs | $0.046 per KWH |
| Next 700 KWHs | $0.0542 per KWH |
| Over 1000 KWHs | $0.050 per KWH |

In support of this rate design, the company presented an analysis of usage growth deal-

number of KWHs consumed.

ing with the period 1973–1978. This analysis illustrated the following usage growth at various levels of consumption:

| USAGE | GROWTH |
|-------|--------|
| 0–500 KWHs | 8.4% |
| 500–1,000 KWHs | 21.2% |
| Over 1,000 KWHs | 7.7% |

As the figures reveal, the charges for electricity in Newport's proposed rates roughly mirror each bracket's usage growth.

■ After considering the evidence, the commission decided in favor of incorporating marginal-cost pricing into the residential rate design. In selecting a computation of marginal cost, the commission settled on a figure of .056 KWH,[3] rejecting the coalition's estimate of $0.068 as too high and the Division of Public Utilities' estimate of $0.0445 as too low. The commission then established the following rate design, which forms the basis of petitioners' challenge:

| Customer charge [4] | $2.80 |
|---------------------|-------|
| First 300 KWHs | $ 0.046 per KWH |
| All Additional KWHs | $ 0.055 per KWH |

In reviewing petitioners' claims, we keep in mind our limited task, to determine whether the commission's decision is "lawful and reasonable and whether its findings are fairly and substantially supported by legal evidence * * *." *Rhode Island Consumers' Council v. Smith*, 111 R.I. at 277, 302 A.2d at 762.

■ The petitioners' first line of attack on the rates is that the marginal-cost figure of .056 KWH is speculative and unsupported by the evidence. Our examination

of the record does not bear this out. Several experts offered marginal-rate figures along with supporting evidence, and the commission chose a number squarely within the range established. It was the commission's opinion that computation of the marginal-cost figure could not be "answered with mathematical certainty" and that estimates varied with the methodology used to develop them. With this in mind, we cannot agree with petitioners' claim that the marginal-cost figure lacked a substantial evidentiary basis.

The petitioners' next argument is that the two-tiered rate design adopted by the commission discriminates against users in the usage group above 300 KWHs. We freely admit that once the residential rates are applied, electricity in the higher tier will be more expensive. But if the commission properly found the differential in price was justified by a differential in the utility's cost of providing service, then the new rates are a valid expression of the commission's authority to allocate the cost of service.

In justifying the manner in which marginal costs were apportioned, the commission stated:

"[W]e believe that the application of marginal cost pricing should be limited to those areas of usage in which the growth has been highest. In selecting the appropriate level of usage we agree with Dr. Wilson and the Company that the marginal costs should be applied to the mid-

3. This $0.056 figure is referred to on page 64 of the commission's report as representing the measure of the company's marginal cost per KWH; yet, elsewhere the commission implies that $0.055 is the accepted marginal-cost computation per KWH. For purposes of this appeal, it is unnecessary to determine which figure the commission actually adopted since either figure is substantially supported by the evidence. We anticipate that once the case is remanded, the commission will identify which of the two figures it did in fact select.

4. "Customer charge" covers the costs of such items as billing costs, meter reading, and discontinuance of service. Newport challenges the customer charge figure of $2.80 on the grounds that it is not supported by legally sufficient evidence. It contends that the commission based the figure on an analysis of data contained in the Gilbert Associates cost-of-service study that was rejected by the commission as "not sufficiently grounded upon a credible factual basis" when the commission considered the study as a basis for Newport's interclass allocation of costs. This court has reviewed the commission's assessment of the study and agreed that it is unreliable "for any purpose." *Secretary of Defense v. Public Utilities Commission*, R.I., 437 A.2d 1342 (1981). The record indicates that the figure was in fact derived from the study in question; we therefore uphold Newport's challenge and find the customer charge invalid.

dle range of consumption (300–1000 KWH). We also believe that the record supports the conclusion that customers using 'between 0 and 300 (KWH) contribute relatively less to the peak' demand than the larger customers [citations to transcript omitted]. * * * Accordingly, we find that the marginal costs should be applied to all usage over 300 KWH. This will encompass the bulk of incremental usage and more specifically, the levels of usage which we find to be most likely to contribute to growth in peak demand."

[4] The state of the record is such that a remand is a necessity. We have said before that "[t]he commission's findings must be fairly and substantially supported by legal evidence and sufficiently specific to enable this court to ascertain if the facts upon which they are premised afford a reasonable basis for the result reached." *Bristol County Water Co. v. Public Utilities Commission*, 117 R.I. 89, 101–02, 363 A.2d 444, 451 (1976). From this statement we extract the principle that the key to meaningful appellate review is the opportunity the record provides to this court to assess the findings of fact so as to determine if they are supported by the evidence. We are unable to make that assessment in this case because of deficiencies in the report prepared by the commission.

In its report, the commission began by adopting LRIC as a pricing scheme; it then apparently chose the peak-responsibility method [5] as a means of allocating costs within the residential class. But after reaching this point, the commission identified the user group "contributing less" to

system peak without giving an adequate explanation of how that conclusion was drawn. The relevant section of the commission's report states that "the record supports the conclusion that customers using between 0 and 300 (KWH) contribute relatively less to the peak" and then provides three citations to the record to buttress the finding. We have read the sections of the record referred to and have difficulty in seeing how the technically abstruse information they contain supports the finding of fact made. Had the commission given us a clearer explanation of what it meant by the use of the words "contribute relatively less to peak" [6] and, more importantly, had the commission provided in a comprehensible manner the reasons why the conclusion drawn logically follows from the evidence relied upon, then this court would have been afforded the opportunity to engage in a purposeful examination of whether the findings of fact are substantially supported by legal evidence.

We have said before in speaking of this court's appellate duties that "if it becomes impossible for us properly to fulfill our assigned function because of the commission's failure to set forth sufficiently the findings and the evidentiary facts upon which it rests its decisions, or the reasons or true bases for its conclusions, we will not speculate thereon nor search the record for supporting evidence or reasons." *New England Telephone & Telegraph Co. v. Public Utilities Commission*, 116 R.I. 356, 363, 358 A.2d 1, 7 (1976). In light of the deficiencies in the commission's report, remand is required.

---

5. This method distributes costs in proportion to a customer's contribution to system peak demand. *See* Bonbright, *Principles of Public Utility Rates* 352 (1961).

6. The record implies two possible and conflicting meanings for this phrase. The commission's report contains a citation to the testimony of Newport's president, who used the phrase to explain the simple notion that a customer who uses a small number of KWHs in a month will probably have a smaller demand during the time of the system peak than a consumer who uses a greater number of KWHs in the same period. A different meaning for the phrase is implied when the commission

indicates that the critical focus in allocating costs by the peak-responsibility method is the ratio of average demand to demand at the time of the system peak. (Commission quoting Huntington, *The Rapid Emergence of Marginal Cost Pricing In the Regulation of Electric Utility Rate Structures*, 55 B.U.L.Rev. 689, 736 [1975].) Under the first definition, demand during the time of the system peak is the measure of who is contributing less, whereas under the second definition, demand at the time of the system peak *in proportion to average demand* determines who is contributing less to system peak.

Accordingly, the records certified to this court are ordered returned to the commission with a direction that it make further appropriate findings. Any party dissatisfied with the commission's supplementary orders may, by a motion filed in this court within twenty days following the commission's action, bring the matter before us for further consideration.

MURRAY, J., did not participate.