Arlene **VIOLET**, Attorney General

v.

**NARRAGANSETT ELECTRIC COMPANY.**

No. 83–603–M.P.

Supreme Court of Rhode Island.

March 11, 1986.

**1150**

Arlene Violet, Atty. Gen., Arthur Loveley, Sp. Asst. Atty. Gen., for petitioner.

Thomas G. Robinson, Peter G. Flynn, Westborough, Mass., for respondent.

## OPINION

KELLEHER, Justice.

The Attorney General,[1] as protector of the public interest, challenges the legality of an order issued by the Public Utilities Commission (PUC or the commission) authorizing the Narragansett Electric Company (Narragansett or the utility) to reduce the rate charged to a specific portion of its customers. The dispute comes before us by way of a statutory petition for certiorari filed pursuant to G.L.1956 (1977 Reenactment) § 39–5–1. In order to put this controversy in its true perspective, a brief recitation of the pertinent facts is in order.

In December 1982 Narragansett sought the PUC's approval of a proposal the utility called "the Narragansett plan." The plan, which was to be of ten years' duration, had as its goal a substantial increase in the number of jobs in the state. The plan's specific targets were those customers whose operations, in the utility's opinion, were more likely to ensure the plan's success. They were Narragansett's industrial and large commercial ratepayers. The keystone of the plan was a 20 percent discount that was to be offered to Narragansett's present and future customers. The discount to present customers would be applied to the nonfuel portion of the customer's bill, provided that the increased consumption would be in excess of 110 percent of the customer's consumption during a historic base period. All electric consumption by new businesses locating in Rhode Island would qualify for the discount, with the discount's being applied to the nonfuel portion of the new ratepayers' bills.

At the administrative level, the Attorney General commended Narragansett for its interest in improving the state's economy but claimed that the discount plan created a preference that cannot pass muster in light of past pronouncements of this court in *Blackstone Valley Chamber of Commerce v. Public Utilities Commission*, 121 R.I. 122, 396 A.2d 102 (1979), and *Rhode Island Consumers' Council v. Smith*, 111 R.I. 271, 302 A.2d 757 (1973), where preferential treatment—in one instance to the disadvantaged and in the other to the elderly—was invalidated. The PUC approved Narragansett's plan, but its approval was restricted to a two-year test period during which Narragansett was to inform the PUC of the number of companies eligible for the discount as well as the names of

---

1. This challenge was originally instituted by Dennis J. Roberts during his term of service as Attorney General. In January 1985 Arlene Violet succeeded Mr. Roberts as Rhode Island's Attorney General.

those customers who actually took advantage of the reduced price.

The Attorney General argues at some length that there is a complete lack of any competent evidence that would indicate that the plan, even considering it as a two-year experiment, was in the public interest or cost justified.

■ Our role in reviewing the commission's findings has been clearly defined. The commission does the factfinding; we do not. Rather, we determine whether the commission's findings are lawful and reasonable, are fairly and substantially supported by legal evidence, and are sufficiently specific to enable us to ascertain if the evidence upon which the commission based its findings reasonably supports the result. *Roberts v. New England Telephone and Telegraph Co.*, 487 A.2d 136, 138 (R.I. 1985); *Interstate Navigation Co. v. Burke*, 465 A.2d 750, 755 (R.I.1983); *New England Telephone & Telegraph Co. v. Public Utilities Commission*, 446 A.2d 1376, 1380 (R.I.1982). In *Rhode Island Chamber of Commerce Federation v. Burke*, 443 A.2d 1236, 1239 (R.I.1982), this court noted that if the commission can properly find a price differential in rates to be justified by a differential in the utility's cost of providing service, the new rates are not discriminatory but rather are a valid expression of the commission's authority to allocate the cost of service.

At the commission's hearing, Narragansett presented credible testimonial and documentary evidence to support its contention that its plan was cost justified. The manager of rate economics at New England Power Service Company told the commission that Narragansett's existing facilities were more than adequate to serve all the needs of its present customers during the plan's proposed ten-year life span as well as the projected growth in its load arising from those industrial and commercial enterprises that chose to take advantage of the discount. The manager was well aware that once the plan was approved, the utility's fuel costs would increase because of the production of additional kilowatt hours. However, he stressed that although the fuel costs would increase, there would be no increase in "generation costs." He presented a marginal-cost analysis,[2] which established that during the life span of the plan the utility's marginal costs would remain below its embedded costs.

The manager's computations were based on an assumption that the price of oil would not exceed $28 a barrel, and that even if the assumption did not hold true, the "increased marginal generation costs" would remain at zero. The witness acknowledged that the favorable balance in marginal-embedded costs would vanish if the price of fuel rose to between $30 and $35 a barrel or if the methodology employed to calculate marginal-generation costs was modified to include a cost for connecting a new customer to the expanded generation system.

Narragansett is an affiliate of New England Power Co. (NEPCO). Most of Narragansett's power is supplied by NEPCO. The director of rates for NEPCO explained to the commission that the Narragansett plan was specifically designed to take advantage of the existing capacity of its transmission and distribution system. This system, he emphasized, was more than adequate to serve the increased load without any increase in capacity costs. This witness, after pointing out that the discount was directed to the nonfuel portion of a customer's bill, stressed that discount sales would not harm Narragansett's present customers because the additional sales of kilowatt hours would spread the fixed production costs. This spread would lower the present consumers' cost of power and at the same time stimulate Rhode Island's economy.

---

**2.** "Marginal-cost pricing" is a general term for a theory that sets the price paid for a service at the cost the utility incurs in providing one additional unit of that service. *See Rhode Island Chamber of Commerce Federation v. Burke,* 443 A.2d 1236, 1238 (R.I.1982).

Opponents of the plan described the plan as speculative and centered much of their remarks on the $28-a-barrel assumption, specifically the volatility of oil prices. Several members of the public, representatives of various agencies, and state officials came before the commission to express their views on the merits of the plan. Understandably, there was a division of thought in which some were pro and others were con.

The Division of Public Utilities and Carriers (the division)[3] presented an economist who took issue with Narragansett's premise that generation costs would not rise during the period the plan was to be in operation. The commission, in approving its modified version of the plan, believed the utility's witnesses and specifically rejected the testimony of the division's economist. Thus, the commission did find that the discount plan was cost justified.

█ Since there is ample evidence to support the conclusion of the commission as to the cost justification of Narragansett's proposal, the sole question deserving any extended comment by us is whether the plan meets the dictates of § 39–2–5(b), which permits a public utility to offer price discounts if the rates in question are deemed "just and reasonable, or required in the interests of the public, and not unjustly discriminatory." The commission expressed the belief that the discount plan was "just and reasonable" and "required in the 'interest of the public.'"

At this juncture, it is appropriate that we refer to the appearance before the commission of one public official. His name is Norton L. Berman, and at the time of the hearing he was director of the Rhode Island Department of Economic Development. Director Berman told the commission of the enormous challenge facing Rhode Island in restructuring its economy. He alluded to the perceptions held by those in the business and industry sectors who, upon being asked to locate here, responded negatively while emphasizing the cost of electricity. He described Narragansett's plan as a "fresh, forceful, and fair proposal to deal with the issues of economic recovery." According to the director, although the plan might not be perfect, Narragansett's endeavor would be a substantial incentive for industry to look upon Rhode Island in a more positive light than it has before.

█ We endorse the commission's conclusion that the discount plan then before it was just and reasonable and in the public interest. The proposal, in the commission's eyes, would serve to give substance to "one of the more pressing needs of this state, that is, the creation of new jobs." We believe that there is no necessity that the commission be convinced beyond a reasonable doubt that Narragansett's plan to create additional job opportunities *will* succeed. It is sufficient if the commission believes that the plan *may* succeed. *See New York State Council of Retail Merchants, Inc. v. Public Service Commission,* 45 N.Y.2d 661, 673, 384 N.E.2d 1282, 1288, 412 N.Y.S.2d 358, 365, (1978). Since there is ample evidence to support the commission's conclusion that the Narragansett plan[4] complies with the requirements of

3. When this controversy was before the commission, the Attorney General represented the division. In *Providence Gas Co. v. Burke,* 419 A.2d 263, 270 (R.I.1980), this court ruled that once the commission had made its decision, the Attorney General rather than the division was the proper party to seek review of that decision. Here, as noted earlier, the Attorney General is representing the public interest.

4. The plan had other facets. One called for a 25 percent discount on electric bills for any customer of record in the state who had exhausted his or her unemployment benefits during the previous six months. The commission, pointing out that the plan would apply not only to the destitute but also to those who had substantial savings, rejected the plan on the basis that it was unduly discriminatory. The final portion of the plan was a promise by the utility to give $100,000 to be used to implement the recommendations of the Strategic Development Commission. Narragansett, through its president, emphasized that the contribution would be considered a below-the-line item expense, that is, an expense not included in the operating expenses

§ 39–2–5(b), the Attorney General's appeal must fail.

Accordingly, the petition for certiorari is denied and dismissed, the writ heretofore issued is quashed, and the records are ordered returned to the commission with our decision endorsed thereon.

that the utility would be entitled to collect from its customers.