### The ENERGY COUNCIL OF RHODE ISLAND

v.

### PUBLIC UTILITIES COMMISSION et al.

### No. 2000–241–M.P.

Supreme Court of Rhode Island.

June 11, 2001.

Allen Rubine/Andrew Newman, Theodore Orson, Providence, for Plaintiff.

Ronald Gerwatowski, Westboro, MA, Paul J. Roberti/Elizabeth Kelleher Dwyer, Providence, for Defendant.

Present: WILLIAMS, C.J.,
LEDERBERG, BOURCIER,
FLANDERS, and GOLDBERG, JJ.

## OPINION

BOURCIER, Justice.

In this case, The Energy Council of Rhode Island (TEC–RI) seeks review of the Public Utilities Commission's (commission) decision increasing the rate of last resort power service (LRS) for nonresidential customers of Narragansett Electric Company (Narragansett). TEC–RI contends that this increase in rates of LRS for nonresidential customers constitutes rate discrimination and, alternatively, that the establishment of the particular LRS rate is not supported by sufficient evidence. This case came before the Court on a statutory petition for certiorari issued pursuant to G.L.1956 § 39–5–1. For the following reasons, we deny the petition for certiorari.

## I

### Background

■ In 1996, the Rhode Island Legislature passed the Utility Restructuring Act of 1996 (P.L.1996, ch. 316, § 1) (URA), which made Rhode Island one of the first states in the nation to approve comprehensive legislation aimed at deregulating the electrical industry. To avoid the economic pitfalls of unbridled deregulation, however, the URA requires each electrical distribution company to offer electricity at a standard power supply offer rate (standard offer) for a transition period to all customers that have not contracted with nonregu-

lated energy suppliers. *See* G.L.1956 § 39–1–27.3(d).

■ Once a customer elects to receive electricity from a nonregulated power producer, the electrical distribution company no longer is required to provide standard-offer service to that customer under the URA. Nevertheless, the URA requires each electrical distribution company to provide LRS "for customers who are no longer eligible to receive service under the standard offer and not adequately supplied by the market because they are unable to obtain or retain service from nonregulated power producers." Section 39–1–27.3(f). The electric distribution company procures its supply of LRS, which it then provides to its customers, by periodically soliciting bids from nonregulated power producers "for such service at market prices plus a fixed contribution from the electric distribution company." *Id.*

## II

### Case Travel and Facts

In this case, Narragansett, an electrical distribution company, solicited bids from various power suppliers to provide it LRS for the six-month period from May to October 2000. Narragansett issued two requests for proposals (RFP) and ultimately selected the bid of Southern Company Energy Marketing, L.P. (Southern).[1] Thereafter, Narragansett filed a request with the commission to increase the LRS rates it, in turn, charges for nonresidential customers.[2] Narragansett proposed gradually increasing the LRS rate for nonresi-

---

1. Narragansett then executed a contract with Southern to supply it with LRS power at the following monthly prices (per kWh):

   "May 2000   3.8¢
   "June   6.5¢
   "July   Market (estimated at 8–10¢)
   "August   Market (estimated at 8–10¢)
   "September   4.0¢

   "October   3.6¢"

2. Narragansett also asked the commission to approve its choice of Southern as the LRS supplier. The commission did so and no challenge to Southern's selection has been raised before this Court.

dents commencing June 1, 2000, with the rate reaching 4.5 cents per kWh (or the average estimated cost of power for that month) in October 2000. It did not seek to increase the rate for residential consumers of LRS. The nonresidential rate previously charged by Narragansett had been equivalent to the standard offer rate of 3.8 cents per kWh for both residential and nonresidential customers.

TEC–RI, an unincorporated, nonprofit organization composed of approximately 100 "large users of gas and electricity," then intervened in the filing before the commission and opposed any change in LRS rates.

Hearings were conducted before the commission on May 19 and May 22, 2000. The commission heard testimony and considered the exhibits that were submitted by Narragansett, the Division of Public Utilities and Carriers (division), and TEC–RI. Narragansett sought to justify the LRS rate increase for nonresidential customers by demonstrating that residential customers lacked opportunities to leave LRS for service provided by alternative suppliers on the competitive market and that, in contrast, nonresidential consumers did have access to alternative sources of power. Peter Zschokke (Zschokke), vice president and director of distribution financial analysis for National Grid-USA, testified on behalf of Narragansett that not a single alternative supplier of electricity currently existed for residential consumers. In contrast, he pointed to evidence indicating that more than 600 commercial or industrial customers had selected service from alternative power sources.

Despite the greater opportunity for business and industrial consumers on the market, Zschokke further testified that many nonresidential customers then elected to receive LRS when their contracts with alternative suppliers expired. Ac-

cording to Zschokke, the nonresidents' selection of LRS had the effect of increasing significantly both the size of the LRS usage load and the deferred "under-recovery." He explained that:

"[c]urrently, the Last Resort Service price is set to match the Standard Offer price. However, the cost of Last Resort Service is higher than the cost of Standard Offer service. Where Standard Offer service is priced to recover actual costs, the Last Resort Service price is not. As a result, a portion of the recovery of the cost of providing Last Resort Service is currently being deferred for recovery at a later date."

He further posited that since nonresidential consumers of LRS consume substantially more electricity than residential customers, a significant increase in the number of nonresidential consumers of LRS would greatly increase the under-recovery. To offset this under-recovery, Zschokke supported Narragansett's proposal to raise the LRS rate for nonresidential customers "from 3.8¢ per kilowatt-hour to 4.1¢ per kilowatt-hour for the month of June, 2000. Thereafter, the Company [Narragansett] proposes to raise the Last Resort Service price by 1 mill per month until October 1. From October 1 and beyond, the price would be set at 4.5¢ per kilowatt-hour or the average estimated cost of power for that month, if the cost is estimated to be higher."

The division offered the testimony of John Stutz (Stutz), vice president at Tellus Institute, a firm devoted to advocacy on energy-related issues. Stutz agreed with Narragansett that since industrial and commercial businesses contributed largely to the rise in LRS power usage and the accompanying cost deficit, the commission would be justified in increasing LRS rates

for these customers.[3] Stutz, however, proposed that the LRS rate for nonresidential customers should be priced monthly based on the cost of power.

TEC–RI offered in support of its opposition to the LRS rate change the testimony of Roger Buck (Buck), TEC–RI's executive director, and James O'Donahue (O'Donahue), utility manager of Toray Plastics (America), Inc. (Toray), a member of TEC–RI. Buck testified that in 1999, fifteen to seventeen of TEC–RI's members voluntarily left the standard offer and contracted with alternative power suppliers on the competitive market.[4] The remaining members of TEC–RI elected to remain on the standard offer rate. In particular, nine or ten of TEC–RI's members that had been receiving standard offer from Narragansett signed individual contracts with Select Energy, a subsidiary of Northeast Utilities and a nonregulated power supplier. Buck explained that TEC–RI and those members electing alternative service "were essentially of the opinion that it was going to be a much more favorable market and we felt that economically it was a good thing to do and we felt strongly that the competitive environment was going to increase rather than decrease." Nevertheless, when these individual contracts with alternative suppliers expired—mostly on December 31, 1999, or on June 1, 2000,—all TEC–RI members who had received power from an alternative source elected to go on LRS, including those nine or ten businesses that previously had received power from Select Energy.

Buck denied that TEC–RI's members had any "choice" or "alternative" to LRS, although it appeared from his somewhat wily testimony that LRS was merely a better economic alternative to other suppliers. Buck explained that TEC–RI on behalf of its members had solicited proposals from Select Energy and approximately twenty nonregulated power suppliers, but contended that it was "unable to obtain a pricing proposal that even approaches last year's Standard Offer price of 3.5¢. In fact, we have been unable to obtain a proposal for the Pool members now in Last Resort Service equal to the current Standard Offer price for 2000 of 3.8¢ per kWh." Buck acknowledged that individual members had sought and received offers from alternate suppliers, but testified that none of these offers was "satisfactory," although he said he had no knowledge of the pricing rates contained in these offers.[5] Buck also suggested that LRS rates should remain the same as standard offer rates until October 1, 2000, and that all under-recoveries should be borne equally by all customers, even if the nonresidential consumers contributed disproportionately to cost deficits.

O'Donahue further denied that his company Toray had a "viable alternative" to

---

**3.** Stutz offered the following statistics:

"Last Resort Service usage has grown from about 370 thousand kWh in December 1999 to 27 million kWh in March 2000. Because the price of Last Resort Service has not covered the cost of power, the deferral balance has grown from $141 thousand in December to about $721 thousand in March. It is expected to reach $953 thousand in April. Since January 2000, 725 commercial and industrial customers have taken Last Resort Service. This caused most of the growth in deferrals mentioned above. In March 2000, about 3 percent of the kWh usage of Last Resort Service was residential. The remainder was non-residential."

**4.** In his oral testimony before the commission, Buck testified that fifteen members of TEC–RI signed contracts with alternate suppliers, whereas in his written testimony Buck explained that seventeen members had contracted with competitive suppliers.

**5.** Buck and O'Donahue also were unwilling to divulge the specific price rates contained in contracts with Select Energy.

LRS. He first noted that "[i]nasmuch as TEC Rhode Island and Toray Plastics made extreme efforts to try to acquire another supplier of electricity, we were unable to do so. So we do not have choices. We were not one of those customers that you mentioned today that were bumped onto last resort service because the cost of energy on last resort service was somewhat cheaper than what the contract was providing. We are not one of those customers. We do not have a choice." Apparently, though, O'Donahue also defined "choice" or "viable alternative" in economic—not absolute—terms as a service offered at a price "below whatever the last resort service price is." O'Donahue explained that it merely could not find a supplier that "would supply power through the summer of 2000 at a fixed rate of 3.8¢ per kWh" and then concluded that "[t]hus, we do not have a viable option to leave Last Resort Service and do not see such an option until after the summer period at the earliest."

After reviewing the testimony and exhibits, the commission on June 2, 2000 issued a written decision and order increasing the LRS rate for Narragansett's nonresidential customers. Specifically, the commission ordered that:

"1. That the Last Resort Service rate for the Company's [Narragansett's] nonresidential customers shall be 4.5¢ per kWh effective for usage from June 1 through and including June 30, 2000.

"2. That the Last Resort Service rates for the months of July and August 2000 shall be equal to the estimated market price for LRS power supply for each month, as reported to the [c]ommission no less than five (5) business days before the first day of such month, *less* a credit per kWh equal to the lesser of (i) one-half of the difference between the Standard Offer rate and the estimated mar-

ket price for LRS for the applicable month, or (ii) 3¢; such rates to be effective for usage on and after the first day of the applicable month.

"3. That Last Resort Service for residential customers shall continue to be priced at the Standard Offer Service rate."

The commission found as a matter of fact that the LRS rates for nonresidential customers should be increased to reflect increases in the cost of acquiring a LRS power supply and that such LRS rates should be phased-in to avoid rate shock to LRS customers.

Thereafter TEC–RI filed a motion requesting the rehearing, reconsideration and retraction of the June 2, 2000 commission order, and later, a motion to stay that order. The motion to reconsider complained, *inter alia*, that the commission had not ruled on the LRS rate for future periods after August 2000, and that failure to establish such rules "deprives customers of the knowledge necessary to evaluate options to LRS service in the competitive market."

Before the commission had ruled on TEC–RI's motions, TEC–RI filed the instant petition for writ of certiorari seeking judicial review of the June 2, 2000 commission order. In its petition, TEC–RI contends, *inter alia*, that the LRS rate increase to nonresidential customers constitutes price discrimination and that the decision causes an "unreasonable price increase to *some* of the largest employers in the State of Rhode Island in violation of continuity considerations." (Emphasis added).

On June 16, 2000, the commission issued a twenty-six page written decision and order incorporating its previous June 2 order and denying TEC–RI's motion for rehearing and reconsideration. In that decision, which comprehensively discussed the URA

and the testimony and evidence before it, the commission clearly was not impressed with TEC–RI's witnesses nor their fastidious contention that no alternative power suppliers existed for TEC–RI's members. The commission found that "TEC–RI testified that it was unable to find an alternative supplier that would provide power for TEC–RI members at prices equal to or less than the current LRS rate of 3.8¢, and that suppliers were available but unwilling to supply power for a contract term acceptable to TEC–RI. This is quite different from having no supplier available." The commission also noted that TEC–RI's members made the initial choice to leave standard offer to purchase power from an alternative supplier and that holding the LRS rate below the prevailing market price would simply frustrate the intent of the URA by preventing the growth of a competitive market.

The commission, responding to TEC–RI's criticism in its motion for reconsideration, also set a LRS rate for "September 2000 and beyond" for Narragansett's non-residential customers that was the greater of "(i) the estimated market price for the Last Resort Service power supply for the applicable month, as reported to the [c]ommission no less than five (5) business days before the first day of such month, or (ii) 4.5¢ per kWh; such rates to be effective for usage on and after the first day of the applicable month." In setting this particular rate, the commission recognized the overarching need to offset the under-recovery costs associated with the LRS power supply. Acknowledging that the LRS supply costs for September and October would drop to 4.0 cents and 3.6 cents, respectively, in Narragansett's contract with Southern, the commission rejected both TEC–RI's proposal to tie the LRS rate to the standard offer rate of 3.8 cents per kWh until at least October 1, 2000, and the division's proposal to fix the LRS rate

at market cost. The commission concluded that both TEC–RI's and the division's proposals to fix the LRS rate failed to address the ongoing LRS under-recovery problem. Accordingly, the commission decided that a rate of 4.5 cents or market price would be the most appropriate. In doing so, the commission relied largely on the proffered testimony of Zschokke, specifically his statement that:

"The Company [Narragansett] has already under-recovered its costs for Last Resort Service. To the extent that the costs continue to exceed the price during the transition period, the deferral of cost recovery would grow. As a result, pricing the Last Resort Service at 4.5¢ would permit some of the under-recovery to be made up to the extent any customers are remaining on the rate. In addition, it would have the effect of encouraging customers to leave Last Resort Service and purchase power in the market. Last Resort Service was not designed as an alternative to the market. Rather, it was designed to be a 'last resort' for those customers who are unable to find a supplier."

It then concluded that:

"The [c]ommission agrees with the Company [Narragansett] that a LRS rate of 4.5¢ (or the market price, if higher) is more appropriate. To the extent that actual power costs decline in the autumn months below the LRS rate, there will be an opportunity to recoup some portion of the LRS under-recovery that is expected to accumulate over the summer months. It will also produce a uniform 4.5¢ LRS rate over the current LRS supply contract period, with the exception of the months of July and August which have costs tied to the prevailing market price. Accordingly, the [c]ommission finds that a LRS rate of 4.5¢ (or market price, if higher) for usage on and

after September 1, 2000 is just and reasonable."

Thereafter, TEC–RI filed a motion to enter a "stipulation in lieu of stay" with this Court. That stipulation was signed by Narragansett, the commission, the division, and TEC–RI, and was accepted by this Court. It established that if this Court determined that the commission's decision concerning LRS was "unlawfully discriminatory, arbitrary, unreasonable, or otherwise unlawful" then "all non-residential customers taking Last Resort Service for the applicable period shall be entitled to a refund for the period during which the unlawful rates were charged." [6]

TEC–RI then submitted its brief to this Court in support of its petition seeking our writ of certiorari. It alleged that:

"(A) * * * [The commission] committed reversible error in violation of the anti-discrimination provisions of R.I. G.L. §§ 39–2–2—39–2–4 when it approved higher LRS rates for non-residential customers than residential customers for periods after June 1, 2000 without any cost justification.

* * *

"(B) The establishment of LRS rates for non-residential customers for September and following with a 4.5¢ floor is not supported by any evidence."

TEC–RI also contended that the commission lacked the authority to establish LRS rates in excess of the "market price" for September and October 2000 under § 39–1–27.3(f).[7] Accordingly, it requests this

Court to reduce the nonresidential LRS rates to the residential rates for all periods after June 1, 2000, to lower residential and nonresidential LRS rates in September and beyond to market cost, and to order a refund to all nonresidential LRS customers as authorized by the stipulation.

## III

### Standard of Review

■ We note at the outset that the Legislature has expressly limited the authority of this Court to review an order or decision of the commission. Section § 39–5–3 provides that:

"The findings of the commission on questions of fact shall be held to be prima facie true, and as found by the commission and the supreme court, shall not exercise its independent judgment nor weigh conflicting evidence. An order or judgment of the commission made in the exercise of administrative discretion shall not be reversed unless the commission exceeded its authority or acted illegally, arbitrarily, or unreasonably."

■ In expounding upon the Legislature's guidance, we also have stated that "[t]he role of factfinder in utilities cases is that of the commission alone, and our review is limited to whether the decision of the commission was fairly and substantially supported by legal evidence specific enough to enable us to ascertain if the facts upon which the commission's decision is premised afford a reasonable basis for the result reached." *Newport Electric*

---

6. In light of this stipulation entered into by the parties, the motion for stay of the commission's order was denied by this Court.

7. The original writ of certiorari challenged as error only the alleged rate discrimination from June to August 2000. The original petition has never been amended, nor were any additional petitions for writ of certiorari filed.

Nevertheless, in its briefs to this Court, TEC–RI raises as issues the alleged rate discrimination after August 2000 and the establishment of LRS rates for periods after September 1, 2000. Because there was no objection to these new averments and since they concern matters of significant public interest, we will proceed to consider them.

*Corp. v. Public Utilities Commission,* 624 A.2d 1098, 1101 (R.I.1993); *see also In Re Island Hi–Speed Ferry, LLC,* 746 A.2d 1240, 1245 (R.I.2000). With this standard in mind, we proceed to consider the substantive allegations.

## IV

### Rate Discrimination

We first address TEC–RI's contention that the commission violated the antidiscrimination provisions of G.L.1956 §§ 39–2–2 through 39–2–4 in its June 2 and June 16, 2000 orders when it approved higher LRS rates for nonresidential customers than residential customers for periods commencing after June 1, 2000, without any cost justification.

These antidiscrimination provisions provide, in pertinent part:

"If any public utility * * * shall directly or indirectly by any device whatsoever, or otherwise, charge, demand, collect, or receive from any person, firm or corporation a greater or less compensation for any service rendered or to be rendered by it in, or affecting, or relating to the transportation of persons or property between points within this state, the distribution of electricity * * * than it charges, demands, collects, or receives from any other person, firm or corporation *for a like and contemporaneous service, under substantially similar circumstances and conditions,* the public utility shall be guilty of unjust discrimi-

nation * * *." Section 39–2–2(a). (Emphasis added.)

"If any public utility shall make or give any *undue or unreasonable preference or advantage* to any particular person, firm, or corporation, or shall subject any particular person, firm, or corporation to any undue or unreasonable prejudice or disadvantage in any respect whatsoever, the public utility shall be guilty of a misdemeanor * * *." Section § 39–2–3(a). (Emphasis added.)[8]

TEC–RI interprets these provisions to permit discriminatory rates only when a cost differential exists in providing services to different classes of consumers. It cites *Rhode Island Chamber of Commerce Federation v. Burke,* 443 A.2d 1236, 1239 (R.I.1982) and *Violet v. Narragansett Electric Co.,* 505 A.2d 1149, 1151 (R.I.1986) for the proposition that if there are price differentials, then disparate rates are not discriminatory. Accordingly, TEC–RI contends that "[a] *fortiori,* if there is no cost differential, the [c]ommission cannot approve different rates at its whim. To do so is the essence of unlawful discrimination."

■ We disagree. Although it was conceded at oral arguments that a cost differential did not exist, this Court has never held under the URA that if a company charges its customers different rates without a cost differential, then the company invariably has engaged in price discrimination.[9] Rather, the pertinent statutory pro-

---

**8.** General Laws 1956 § 39–2–4 provides:

"It shall be unlawful for any person, firm, or corporation knowingly to solicit, accept, or receive any rebate, concession, or discrimination in respect to any service in, affecting, or relating to the transportation of persons or property, or affecting or relating to the distribution of electricity * * * at a less rate than that named in the published

schedules and tariffs in force as provided therein."
While TEC–RI also argues that Narragansett violated this provision, § 39–2–4 is inapplicable to this case because Narragansett did not "solicit, accept, or receive" any rebate.

**9.** We also note that TEC–RI's reliance upon *Burke* and *Violet* is misguided. TEC–RI quotes from *Violet* that "if the commission can properly find a price differential in rates

visions merely prohibit varying rates for a like and contemporaneous service provided under substantially similar circumstances or rates that confer an undue or unreasonable preference or advantage upon a customer group.

■ In this case, based on the record before us, it is evident that residential and nonresidential consumers of LRS electricity were not laboring under substantially similar circumstances and like conditions. There is ample evidence in the record to support the commission's conclusion that nonresidential and residential customers were not similarly situated because of the dearth of opportunity for residential consumers to secure alternative sources of power. Indeed, we point specifically to the testimony of Zschokke, which was noted by the commission in its decision, that not a single supplier of electricity was offering service to residential customers. In contrast, plentiful evidence in the record discloses that business and industrial consumers had considerable opportunities to secure power on the competitive market. Accordingly, under these varying circumstances, it was not "unreasonable" or an "undue" preference or advantage for the commission to establish varying LRS rates for nonresidential and residential consumers.

TEC–RI apparently recognizes that alternate suppliers were not available to provide service to residential customers, but contends that TEC–RI also presented testimony that nonresidential customers had no viable power supply options. It asserts that the "[c]ommission elected to disbelieve the testimony of the TEC–RI witnesses" and that no basis existed to reject that testimony. We disagree. A careful review of the commission transcripts reveals that TEC–RI's witnesses—Buck and O'Donahue—testified in very persnickety language that no "choice" or "viable" alternatives existed in the competitive market. Rather, as the commission properly found, TEC–RI and its members did have alternates on the market, but merely were unwilling to enter into a contract for services at prices greater than the LRS or standard offer rate. As the commission succinctly concluded, this economic rationale is "quite different from having no supplier available." Nevertheless, even assuming *arguendo* that TEC–RI's witnesses did testify that absolutely no alternate suppliers for LRS existed, this Court will not weigh conflicting witness testimony and it was within the commission's fact-finding powers to accept or reject the testimonial evidence before it. Accordingly, we discern no merit in TEC–RI's allegation.[10]

## V

### Adequacy of Rates

TEC–RI also challenges the commission's establishment of LRS rates for non-

to be justified by a differential in the utility's cost of providing service, the new rates are not discriminatory but rather are a valid expression of the commission's authority to allocate the cost of service." *Violet v. Narragansett Electric Co.*, 505 A.2d 1149, 1151 (R.I. 1986). Both cases arose before the URA was enacted. However, in neither case did this Court explicitly or implicitly pronounce that a cost differential was the only justification for rate disparities. To interpret these cases and the antidiscrimination statutory provisions in the way TEC–RI asserts is both misguided

and appears to constitute a spurious application of logic.

10. While we discern no error in TEC–RI's allegation of rate discrimination, we do note from the record that LRS rates for many laudable businesses and industries in this state have increased significantly. Nevertheless, we believe that the Legislature and the commission are best-suited institutionally to evaluate the varying policy considerations in deciding whether to increase electrical rates.

residential customers for September 2000 and beyond at a rate of the greater of "(i) the estimated market price for the Last Resort Service power supply for the applicable month" or "(ii) 4.5 cents per kWh." TEC–RI first contends that the URA requires under § 39–1–27.3(f) that the LRS rates remain no higher than the market price to acquire such service. Since in this case the commission established LRS rates for nonresidential customers at the greater of 4.5 cents per kWh or market price for September and October 2000, even though Narragansett acquired the LRS power supply at 4 cents and 3.6 cents per kWh for those months, respectively, TEC–RI claims that the commission exceeded its authority. We disagree.

■ Section 39–1–27.3(f) merely requires the electric distribution company—in this case Narragansett—to solicit bids from nonregulated power producers for last resort service at "market prices plus a fixed contribution from the electric distribution company." The statutory section does not attempt to establish a regulatory scheme for the rates that the electrical distribution company in turn may charge its customers for LRS. In fact, the statute later explicitly provides that the "[a]cceptance of bids by the electric distribution company and the terms and conditions for such last resort service shall be subject to approval by the commission." Section 39–1–27.3(f). Accordingly, we are not persuaded by TEC–RI's argument.

■ Finally, TEC–RI contends that the establishment of the LRS rate for nonresidential customers at a floor price of 4.5 cents per kWh is "arbitrary and not supported by any legal evidence." It further

maintains that there is "no evidence or testimony by any party to advocate or to justify creation of a floor or minimum price above cost." Again, we disagree.

The commission had before it ample evidence, which it clearly noted in its decision, to set the rate of LRS at the greater of 4.5 cents per kWh or market price. The commission considered the precise amounts of LRS under-recovery that could be expected to accumulate from June to October 2000 without an increase in the LRS nonresidential rates. It also had before it the varying rate proposals from Narragansett, the division, and TEC–RI, and testimony about their anticipated effect on the under-recovery. The commission further contemplated closely the testimony of Zschokke that if Narragansett's proposal to increase rates were accepted, then the incremental LRS under-recovery from May through October 2000 would be significantly reduced. The commission also accepted his contention that setting the LRS at 4.5 cents per kWh would permit much of the under-recovery to be made up and would encourage customers to leave LRS and purchase power on the market. Accordingly, we conclude that the commission's decision was properly and reasonably supported by the evidence that was adduced at the hearings, and that the facts as noted in the commission's decision afforded a reasonable basis for the commission to set the LRS rates at the level that it determined.[11]

Because we conclude that no credible evidence of price discrimination is found to exist in the overall record of the commission's proceeding, and that the set rates are properly supported by the record, we

---

11. Despite our affirmation of the commission's decision in the particular proceeding, including the establishment of the LRS rates, in all future rate-setting cases, we will expect the commission's orders to point more pre-
cisely to the evidence that it relies upon in the record when seeking to justify rate levels, and not leave to this Court the added task of locating that evidence in the record.

need not address TEC–RI's contention that its members were entitled to a refund under the terms of the stipulation in lieu of stay that had been entered in this proceeding.

## VI

### Conclusion

For the reasons stated above, TEC–RI's petition for certiorari is denied; the writ heretofore issued is quashed, and the decision of the Public Utilities Commission is affirmed. The papers in this case are remanded to the commission with our decision endorsed thereon.